Charlie LIVINGSTON

v.

The STATE of Texas, Appellee.

No. 69477.

Court of Criminal Appeals of Texas.

Oct. 21, 1987.

Barbara L. Burnett, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and Kathlyn Giannaula, Glenn Gotschall and Jim Peacock, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was convicted in Harris County of capital murder. See V.T.C.A., Penal Code § 19.03. After the jury affirmatively answered the three special issues in Art. 37.071, V.A.C.C.P., the trial court imposed the death penalty as required by law.

The indictment alleged the murder of Janet Caldwell in the course of committing and attempting to commit the underlying felony of robbery. V.T.C.A., Penal Code, § 19.03(a)(2).

Twenty points of error [1] are advanced by appellant on direct appeal. In one point he claims error in not quashing the indictment. In three points he contends the trial court erred in excluding for cause three prospective jurors in violation of *Witherspoon v. Illinois,* 391 U.S. 511, 88 S.Ct.

---

1. Appellant has mistakenly identified his contentions as "grounds" of error. We will refer to his claims as "points" of error in accordance with the Texas Rules of Appellate Procedure, Rules 74(d) and 210(b).

1770, 20 L.Ed.2d 776 (1968). In five points of error appellant complains of the trial court overruling his motion to suppress and subsequent introduction into evidence of various physical items. In two points he complains of the admission of a witness's written statement into evidence as impermissible bolstering and hearsay. In another point he claims that a witness's on-the-scene oral identification statement was improperly admitted. In two points of error appellant argues that a witness's in-court identification was impermissibly tainted by an improper line-up procedure, and that the trial court erred by not granting a mistrial when a witness mentioned the suppressed lineup. In one point he contends he was improperly denied a jury instruction on the lesser included offense of murder. In another point he complains of the trial court's failure to grant a mistrial when the prosecutor commented on his failure to testify during final argument. Finally, in four points of error appellant contends that the evidence is insufficient to sustain either the guilty verdict or the affirmative answer given to all three special issues submitted at the punishment phase of trial. Given appellant's claims of insufficiency as to both stages of trial, a recitation of the rather lengthy facts as shown by trial testimony is both necessary and helpful in this case.

Thirty-five witnesses testified for the State during the guilt-innocence phase of trial including eye witnesses to the crime, witnesses who testified as to the subsequent conduct of the killer, and expert testimony regarding the physical and medical evidence introduced by the State. Viewed in the light most favorable to the verdict, the record reflects the following facts.

On August 10, 1983, at approximately 8:00 p.m. the deceased, Janet Caldwell, left her home in her black Chevrolet pickup truck and drove to the Weingarten's supermarket located on West 43rd Street in Houston to purchase groceries. The parking lot serving Weingarten's and other businesses is bounded by West 43rd Street on the south and Oak Forest Drive on the west. On the same evening, Lisa Janda also drove to the Weingarten's store and parked on the west side of the store next to the deceased's truck. Pulling into the lot, Janda noticed the legs and tennis-shoe-encased feet of someone lying underneath the deceased's parked truck. As she exited her own car and walked past the black pickup Janda greeted the unknown person but received no reply. At about the same time Ernest Warren, a casual acquaintance of the deceased, also noticed the deceased's truck in the parking lot but did not see anyone standing around the vehicle. As Warren walked toward the entrance to the store he encountered the deceased, who was exiting the store carrying two grocery bags and a purse. The two exchanged brief pleasantries and went on their respective ways, Warren into the store and the deceased toward the rows of parked vehicles.

LaVerne Morton was leaving the store by the west exit when he heard two screams and a cry for help. Approximately 70 to 100 feet away among the parked vehicles he observed a black male struggling with a white female next to a pickup truck. Morton testified that he saw the woman's head bobbing back and forth like she was holding on to something. After the outcry he heard two gunshots in close succession, then saw the assailant run west across the parking lot. Pausing beside a trash dumpster located next to the Parade Green Thumb Nursery on Oak Forest Drive, the assailant dropped something beside the dumpster, then ran north on Oak Forest Drive. At trial, Morton identified appellant as the assailant based upon appellant's physical description and clothing.

Lynne Coleman testified that she also pulled into the Weingarten's parking lot that evening and parked in a space in front and slightly to the left of the deceased's pickup truck. She testified that the driver's door to the truck was open, and through the window of the pickup she observed the arms of two people struggling. Being wary of the situation, Mrs. Coleman remained in her car throughout the incident and did not see the assailant, although she heard a gunshot during this time.

Donald Austin was at Weingarten's with his wife and brother-in-law on the evening in question. As he walked toward the entrance to the store, he heard a scream. He turned, didn't see anything unusual, and turned back to continue. Hearing a second scream, he turned around and ran back toward the sound. After five or six steps he heard a gunshot or shots close together and saw the flash from the muzzle of the gun as it was fired. He observed two people, very close together, then a black man ran around the rear of the pickup, toward Oak Forest Drive. The man, who was wearing dark clothes with some type of lettering on the back of his shirt, tripped but picked himself up. He appeared to drop something at the dumpster, then turned right or north on Oak Forest Drive, and disappeared from view behind the nursery. Austin was the first individual to arrive at the victim's side.

Joe Cunningham had left the Weingarten's store and was at his own car when he heard a scream and observed two people ahead struggling. He saw a black male pull a pistol out and shoot the white woman. According to Cunningham, the assailant had shoved the woman back or pushed away from her. Then he had reached back, pointed the gun with his right hand and shot her. The assailant stumbled and then ran in the opposite direction toward a Gulf Service Station across the street from the parking lot and nursery on Oak Forest Drive, carrying what looked like a gun and a purse. Within 15 minutes police returned to the scene with a suspect. Cunningham went over to see the black male sitting in the back of the police car. Although he could not positively identify the man as the deceased's assailant since the killer had worn a white cloth over his face during the incident, Cunningham told police that the clothes, dark pants and dark shirt with white lettering, looked the same, and that the man in the back of the police car had the same build and features as the killer.

Raul and Flor Monzon were crossing the intersection of Oak Forest and West 43rd Street when Mrs. Monzon heard a woman scream. Mr. Monzon pulled the car into a Gulf Service Station across the street from the parking lot. Through the windows of their car, the Monzons observed a black male running through the parking lot and up to a dumpster across the street from them. Mrs. Monzon observed a covering over the man's face and testified he carried a gun in his right hand and a woman's handbag in his left hand. The man was wearing dark pants and a dark shirt with white lettering. Mr. Monzon remembered the black male crouching behind the dumpster, his eyes moving back and forth, but could not remember specifics as to the man's face or clothing. From the dumpster the man ran north up Oak Forest Drive and into a subdivision. The Monzons then drove over to the scene of the crime. Within 10 or 15 minutes after the man disappeared the police brought back a suspect who Mrs. Monzon identified as the man whose conduct she and her husband had observed. The basis of her on-the-scene identification was the man's physical characteristics as well as the clothing he was wearing. At trial she identified the appellant as the man she saw in the patrol car.

Two high school students, Donald McDaniel and Jerry Thompson, were working at the Oak Forest Gulf Station on the evening of August 10th. They heard screams and a gunshot. They saw a man back up from a pickup truck, turn and run toward the station and hide behind the dumpster across the street. The man was described as a black male, wearing dark clothes with something white over his face. The man was carrying a gun and a purse. As he crouched behind the dumpster, the man pointed a gun at the two young men across the street. Shortly thereafter the man ran from the dumpster, crossed the street and went behind the station. He was next seen running from behind the building down Oak Forest toward Overhill Street in the subdivision. Both boys remembered seeing Raul and Flor Monzon drive up and park in the station. McDaniel later identified the man brought back by the police to the crime scene as the man he had observed.

Mr. and Mrs. Bruce Norton were also in the Weingarten's parking lot at about 9:00 p.m. that evening. While walking toward the store Mrs. Norton heard a scream and a gunshot, and observed a black male dressed in dark clothes and tennis shoes walking quickly with a woman's purse under his arm. She yelled to her husband, who turned his car around and chased the man. Mr. Norton saw the man go around the corner of the nursery. Following the man, Mr. Norton walked along the side of a building in the direction of the nursery. He found a purse lying beside a dumpster close to the nursery. Walking further down the street Mr. Norton observed the man throw what appeared to be a white cloth into the bushes, then disappear around the corner of a house. Mr. Norton walked over and observed the cloth on the ground, then walked around the corner on Overhill Street and down an alley until he came out on 43rd Street again. At trial both Mr. and Mrs. Norton testified that the man brought back to the crime scene appeared to be the same man they observed running from the scene ten or fifteen minutes earlier.

Houston Police Officers James and Margie Curtis (formerly Margie Liescheski) were on routine patrol about 9:00 p.m. on West 43rd Street on the evening of August 10th when they stopped and checked with another unit driven by Officer David Cook. An unidentified male citizen drove up and informed the officers that a shooting had occurred in the Weingarten's parking lot. Both units immediately left the scene and drove to the indicated general area, Officer Cook pulling into the west end of the lot while Officers Curtis pulled into the east end of the shopping center.

Several moments after receiving the information of a shooting, Officers Curtis observed a man emerging from the dimly lit, isolated area behind the Weingarten's store. When the young black male [2] saw the patrol car, he turned and walked in the opposite direction. The officers pulled their patrol car up to the man, and Officer James Curtis got out and spoke to him. The individual, identified by both James and Margie Curtis at trial as appellant, denied any knowledge of a shooting, telling the officers he had been shopping inside the Weingarten's store. Both officers testified that the appellant was sweating profusely, that his pants were ripped from his knee up to his crotch area, exposing his underwear, and that he carried no grocery bags. Appellant could provide no identification since he had "forgotten" his wallet, but identified himself as Charlie Livingston.

Officer James Curtis then asked appellant if he would mind accompanying the officers to the other end of the parking lot while they investigated the alleged shooting. Appellant agreed. After a quick patdown for weapons, appellant entered the back of the patrol car and the officers drove to the west end of the parking lot where a group of people were congregated near Officer Cook's police unit. As they approached the scene the appellant asked what he was being charged with and was told that he was not being charged with anything at that time.

Arriving at the scene, Officer Margie Curtis walked over to Officer Cook's vehicle and found him broadcasting a description of the homicide suspect over the radio. She informed Cook that the description matched that of the man sitting in the rear of the Curtis patrol car. The officers allowed several eyewitnesses to separately observe appellant in the car. After being identified as the assailant, appellant was removed from the car, read his rights, thoroughly searched and handcuffed. A set of car keys was recovered from his pocket, and officers located appellant's car parked behind the Gulf Service Station on Oak Forest Drive. According to employees at the station, the car had been parked at that location for at least two hours before the shooting.

H.P.D. Officer Troy Blando testified that when he arrived at the scene at approximately 9:25 p.m. the victim was lying face

---

**2.** Appellant was 21 years of age on the day Ms. Caldwell was shot and had passed his 23rd birthday when convicted of the murder in April of 1985.

up in the parking lot between two pickup trucks with a gunshot wound to her throat. He observed various personal items strewn around her body and that she was lying on the flap covering of a purse. Further inspection of the area disclosed a spent 9mm shell casing six to eight feet from the body. Upon being directed to the dumpster at the end of the parking lot about 230 feet west of the body, Officer Blando discovered the remainder of the deceased's purse and contents. Walking north on Oak Forest Drive, Blando found a piece of white cloth covering a 9mm semi-automatic pistol. The pistol was loaded and cocked, containing six live rounds. Mr. Walter Duckett, a Houston restaurant owner, testified at trial that the pistol had been stolen from him on January 25, 1983.

Further investigation revealed four footprints in damp soil leading from the area of the cloth and pistol and in a direction back toward the Weingarten's store. Blando made a plaster cast of one of the prints. Appellant's tennis shoes were confiscated and at trial, Wesley Sheldon, a latent fingerprint examiner with H.P.D. who is also experienced in footprint comparisons, testified that, although a positive identification could not be made, due to the many similarities of size, wear and pattern between the cast and the shoe there was a high probability that the shoe created the imprint preserved in the plaster.

While he was detained at the crime scene, paper bags were placed over appellant's hands. He was taken to the homocide division of the H.P.D. for a trace metal test to determine if he recently had held a metal object. After the bags were removed and the test explained to him, appellant became visibly nervous and began rubbing his hands together. H.P.D. Sargeant Osterberg was forced to hold appellant's hands apart. At this time Osterberg noticed that appellant had what appeared to be a fresh cut on the palm of his left hand and soil particles on his arms and pants.

Officer J.K. Jones conducted the trace metal test. After spraying appellant's hands, he viewed them under ultraviolet light and observed a purplish black pattern in appellant's right hand. Unfortunately, another officer who was assisting Jones, Officer Anderson, mistakenly switched off the light, plunging the room into darkness. When the light was turned back on, the dark pattern on appellant's hand was replaced by a shiny spot. In full lighting the officers observed a large "gob" of spit in appellant's hand.

The officers then decided to test appellant's waistline in case he had carried a weapon in the waistband of his pants. Due to appellant's lack of cooperation, his hands were cuffed behind his back. Officer Jones then sprayed appellant's chest area and switched the lighting, but discerned no type of pattern on the treated area. When the overhead lights were switched back on, appellant was observed to have spat upon his chest, with spittle still remaining on his lips and saliva running down from his mouth to his chest.

The tests being inconclusive in nature, appellant was next interviewed briefly by Officer Anderson. After being warned of his rights, appellant told the officer, "I didn't do anything. I don't have anything to say." Anderson left and a few minutes later Osterberg went into the room, and again warned appellant of his rights. Appellant said he understood his rights and that he would talk to Osterberg. He told the officer that he "wasn't there," "didn't do it." When the officer asked how his pants had gotten ripped to the crotch, appellant said it had happened while getting off a forklift at work that day. But when Osterberg asked appellant where he worked, appellant said that he did not want to talk anymore.

At a lineup conducted a short time later appellant was required to wear the same clothing in which he was arrested and was the only individual in the lineup appearing in a dark shirt with white lettering. Ruling that the procedure was impermissibly suggestive, the trial court granted appellant's pretrial motion to suppress any mention of the lineup.

The next morning Sergeant Paul Motard took appellant from his cell and before a magistrate who again read him his *Mi-*

*randa*[3] warnings. It was clarified that appellant was charged with capital murder. The officer was instructed to allow appellant to use the telephone. Appellant reached his grandfather on the third call and the man apparently told appellant to "tell the truth." After hanging up the telephone, appellant confessed to the shooting.

After signing a statement,[4] appellant was taken to the crime lab where he gave written consent to have various hair samples taken. Afterwards, he was returned to the homicide division where he was again read the *Miranda* warnings and consented to a search of his residence approximately four miles from the crime scene. Appellant accompanied Sergeant Motard to that location, where a cardboard box containing ten 9mm Lugar cartridges was recovered. Store manager Ronnie Hubert testified that appellant had purchased a box of 9mm cartridges on March 11, 1983, from his sporting goods store. H.P.D. firearms examiner C.E. Anderson testified on the basis of tests he performed, the ammunition recovered in the search of appellant's residence was made by the same manufacturer and was of the same caliber as the ammunition recovered from the pistol, that the spent cartridge case found close to the body of Janet Caldwell was fired from the pistol, and that a fired bullet jacket fragment removed from the deceased's body was consistent with the manufacture, caliber and design of the spent shell casing and the ammunition recovered from appellant's apartment. Anderson further testified that the shot was fired within 15 or 20 inches from the victim's throat.

Police chemist Donald Krueger performed tests on the recovered pistol and compared hair samples removed from the white cloth with known hair samples of appellant. He testified that the purplish to black color observed by Officer Jones on appellant's right hand was consistent with a person holding an iron object such as the recovered weapon. The hair sample comparison was not conclusive, but it could be determined that both samples had similar pigmentation and were both Negroid in origin.

The final witness for the prosecution was Dr. Vladmimir Parungao, assistant medical examiner for Harris County. Dr. Parungas testified that he performed an autopsy on the body of the deceased and determined the cause of death was due to a close range gunshot wound of the neck into the chest, through the throat. According to Dr. Parungao, the bullet traveled from front to back downward and toward the left, with an entrance wound nine and one-half inches from the top of the head and an exit wound eleven inches from the top of the head. There were no cuts, abrasions, or powder stippling anywhere on the deceased's hands or fingers. Due to the level of entry and exit wounds, the pistol was almost level when fired.

Except for appellant's confession, the evidence outlined heretofore was submitted to the jury who returned a verdict of "guilty" in less than an hour and a half.

At the punishment phase the prosecution produced several witnesses who testified as to appellant's prior criminal record and reputation in the community. Charles Ed Smith testified that appellant had repeatedly stabbed him and his girlfriend Frankie in December of 1978. A former deputy district clerk testified that in connection with this incident appellant pled guilty to two counts of attempted murder and was sentenced to a ten-year probated term on each count.

Other witnesses, including police officers and appellant's high school principal, testified that appellant's reputation in the community for being a peaceful and law abiding citizen was bad. In addition, a sheriff's deputy told the jury that a homemade knife known as a "shiv", fashioned out of a toothbrush, was discovered in appellant's cell during a surprise search after he was arrested on the instant offense.

The first and last witness for the defense was appellant's mother, who testified that

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

4. Neither party introduced the confession into evidence at trial.

appellant was a good son and had been affected by his father's death. She asked for the mercy of the jury.

At defense request, all three special issues were submitted to the jury and each was subsequently answered in the affirmative. The trial court imposed the death penalty as required by Art. 37.071, supra.

In his first point of error appellant contends that the trial court committed reversible error in denying his motion to quash the indictment, since the word "gun" failed to give adequate notice of the charge against him. The indictment alleged, in pertinent part, that the appellant was unlawfully

> while in the course of committing and attempting to commit the Robbery of JANET CALDWELL, hereinafter styled the Complainant, intentionally cause the death of the Complainant by shooting the Complainant with a gun.

As a threshold matter, we agree with appellant that his motion, filed almost one year before the hearing on said motion was heard, was timely filed and properly before the trial court. See *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976). We may therefore reach the merits of his claim that the indictment should have been quashed since the State did not specifically plead what type gun was used. Appellant relies upon Art. 21.04, V.A.C.C.P.[5] and Art. 21.11, V.A.C.C.P.[6] and invokes Article I, Section 10 of the Texas Constitution.[7]

When a challenge to an accusation for failure to provide adequate notice on which to prepare a defense is properly and timely asserted with adequate statement of the manner in which notice is deficient, "fundamental constitutional protections are in-

voked." *Adams v. State*, 707 S.W.2d 900 (Tex.Cr.App.1986), citing *Drumm v. State*, 560 S.W.2d 944 (Tex.Cr.App.1977). Moreover, Art. I, Sec. 10 of the Texas Constitution mandates that the notice petitioned for must come from the face of the charging instrument. *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); *Moore v. State*, 532 S.W.2d 333 (Tex.Cr.App.1976), *Voelkel v. State*, 501 S.W.2d 313 (Tex.Cr.App.1973). The adequacy of the allegation must be tested by its own terms "in a vacuum, so to speak." *Adams v. State*, supra, citing *Bonner v. State*, 640 S.W.2d 601 (Tex.Cr. App.1982).

At the same time that an indictment must facially allege sufficient facts to give a defendant proper notice of the charge under Arts. 21.04 and 21.11, both supra, unless a fact is essential to notice, the indictment need not plead the evidence relied upon by the State. *Thomas v. State*, 621 S.W.2d 158 (Tex.Cr.App.1981); *May v. State*, 618 S.W.2d 333 (Tex.Cr.App.1981); *Phillips v. State*, 597 S.W.2d 929 (Tex.Cr. App.1980). If additional information requested in a motion to quash is evidentiary in nature and not required for notice or plea in bar, the indictment is sufficient. The important question is whether a defendant has notice adequate to prepare his defense. *Adams v. State*, supra. In *Adams*, supra, the Court provided a three-step test for determination of this question:

> The first step in answering this (notice) question is to decide whether the charging instrument failed to convey some requisite item of 'notice'. If sufficient notice is given, this ends our inquiry. If not, the next step is to decide whether, in the context of the case, this had an impact on the defendant's ability to prepare

---

**5.** Art. 21.04, V.A.C.C.P. states:
> The certainty required in an indictment is such as will enable the accused to plead the judgment that may be given upon it in bar of any prosecution for the same offense.

**6.** Art. 21.11, V.A.C.C.P. states:
> An indictment shall be deemed sufficient which charges the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the

defendant notice of the particular offense with which he is charged and enable the court, on conviction, to pronounce the proper judgment; and in no case are the words 'force and arms' or 'contrary to the form of the statute' necessary.

**7.** That provision of the State Constitution provides in part that a criminal defendant has the right to demand the nature and cause of the accusation against him and to have a copy of the accusation.

a defense, and, finally, how great an impact.

*Adams v. State,* 707 S.W.2d at 903. See also *Labelle v. State,* 720 S.W.2d 101 (Tex. Cr.App.1986).

■ We need go no further than the first step. It is well settled that indictment language alleging the murder weapon as a "gun" is sufficient without further specific description of the type of gun. See *Dickson v. State,* 134 Tex.Cr.R. 22, 113 S.W.2d 528 (Tex.Cr.App.1938); see also, *Nelson v. State,* 573 S.W.2d 9 (Tex.Cr.App.1978). We find that the charging instrument in question did not fail to convey some requisite item of "notice", but charged the commission of the offense "in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant, and with that degree of certainty that will give the defendant notice of the particular offense with which he is charged." *O'Briant v. State,* 556 S.W. 2d 333 (Tex.Cr.App.1977), citing Art. 21.11, supra.[8] Appellant's first point of error is overruled.

In his second, third and fourth points of error appellant contends that the trial court's exclusion of prospective jurors Yvonne Spillane, Inez McIntosh and Denise Carcel Morgan, was in violation of the requirements of *Witherspoon v. Illinois,* supra, and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

In *Witherspoon,* supra, the Supreme Court held that a prospective juror may not be excluded by the trial court for cause unless the record reveals with absolute and unmistakable clarity that the venireperson would automatically vote against imposition of capital punishment regardless of the evidence introduced, or that the person's attitude regarding the death penalty would prevent him from making an impartial decision as to the defendant's guilt. This strict standard was modified by the Court decision in *Adams,* supra, to read, "[A] juror may not be challenged for cause based on

his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.*" 448 U.S. at 45, 100 S.Ct. at 2526. (Emphasis in original.)

This Court has previously held that prospective jurors whose views would have prevented or substantially impaired their performance as jurors in accordance with their instructions were properly excused in light of *Witherspoon* and *Adams,* both supra. See *Carter v. State,* 717 S.W.2d 60 (Tex.Cr.App.1986); *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App.1981); *Smith v. State,* 676 S.W.2d 379 (Tex.Cr.App.1984); *Bird v. State,* 692 S.W.2d 65 (Tex.Cr.App. 1985); *Griffin v. State,* 665 S.W.2d 762 (Tex.Cr.App.1983); *Porter v. State,* 623 S.W.2d 374 (Tex.Cr.App.1981); *Bass v. State,* 622 S.W.2d 101 (Tex.Cr.App.1981).

Finally, in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the *Adams* standard was declared proper and preferable to the strict standard of *Witherspoon. Witherspoon* is no longer the standard for determining whether a challenge for cause by the State has been improperly granted. *Montoya v. State,* —— S.W.2d —— (Tex.Cr.App. No. 69,186, delivered February 18, 1987); *Carter v. State,* supra; *Sharp v. State,* 707 S.W.2d 611 (Tex.Cr.App.1986); *Bird v. State,* supra.

In evaluating a prospective juror's responses, we recognize that we are faced with only a cold record; therefore, we give deference to the trial judge who is in a position to evaluate the venireman's sincerity and demeanor. *Barnard v. State,* 730 S.W.2d 703 (Tex.Cr.App.1987). *McCoy v. State,* 713 S.W.2d 940 (Tex.Cr.App.1986); *Bird v. State,* supra. See also *Phillips v. State,* 701 S.W.2d 875 (Tex.Cr.App.1985); *Franklin v. State,* 693 S.W.2d 420 (Tex.Cr. App.1985).

---

**8.** If further analysis under the *Adams* test was necessary, the record reflects that at appellant's pretrial hearing on his motion to quash, defense counsel, in response to a question from the court, told the trial judge that the gun was a 9mm pistol. Whether the information came about through discovery or another source, it is clear any alleged lack of specificity in the indictment had *no* impact on appellant's ability to prepare his defense.

In addition to the above, it is noted that Art. 35.16, V.A.C.C.P. provides in pertinent part:

(b) A challenge for cause may be made by the State for any of the following reasons:

(1) That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty;

\* \* \* \* \* \*

(3) That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

Certainly, bias or prejudice against the range of punishment applicable by law, including the death penalty, is a proper area of inquiry before exercising a challenge for cause or a peremptory challenge. See *Carter v. State*, supra; see also *Mathis v. State*, 576 S.W.2d 835 (Tex.Cr.App.1979); *Martinez v. State*, 588 S.W.2d 954 (Tex.Cr. App.1979).

With all of this in mind, we turn our attention to the examination of the three venirepersons at issue. We have reviewed the voir dire of all three prospective jurors and will first turn to Yvonne Spillane.

The voir dire examination of Ms. Spillane covers fifty pages of the record and initially shows a vacillating prospective juror. She first said that she could answer all three special issues in the affirmative, but retracted her response when informed that the unanimous affirmation of the special issues would result in assessment of the death penalty. When asked if she was capable of taking the juror's oath, she initially told the court that she would "prefer not to." Pressed for a definite response, she stated, "Not today, no." With the agreement of both the State and appellant, Ms. Spillane was excused for the evening to spend some time thinking about the questions propounded to her.

The following morning Ms. Spillane was recalled and the questioning continued by both counsel and the trial judge. The record reflects that the venirewoman was even more adamant in her views that she would always answer "no" to one of the special issues and that she would refuse to take or abide by her oath as a juror:

Q. Are your feelings so firm that you would automatically vote against the death penalty regardless of what the facts of the case might show?

A. Yes, Ma'am.

\* \* \* \* \* \*

Q. Are you further telling me that in order to avoid the imposition of the death penalty that you would answer one of the special issues 'No' simply to avoid the imposition of the death penalty?

A. Yes, Ma'am.

\* \* \* \* \* \*

Q. Rather than say just 'Yes' or 'No', state in your own words how you feel?

A. Basically, I—this whole thing comes if I take the oath. I have to be completely honest and I would have to answer the questions 'Yes' but I'm not able conscientiously or emotionally right now to take that oath and handle that. . . .

\* \* \* \* \* \*

Q. Are you saying then you could not abide by your oath?

A. Yes, Ma'am.

\* \* \* \* \* \*

Q. There are some people that are so unalterably opposed to the death penalty that if I were to say, for instance, 'Mr. Jones, I have selected you to be a juror in this case,' that they would refuse to take the oath; Do you follow, you understand that example?

A. Yes.

Q. Would that describe you?

A. Yes.

\* \* \* \* \* \*

Q. Are you telling me then you could not set aside your feelings?

A. No.

Q. In sentence form?

A. No, Ma'am, I could not set aside those feelings.

In overruling the objection to granting the State's challenge for cause, the court clearly stated its basis for exclusion as being that Ms. Spillane would automatically vote against the death penalty and would refuse to take the oath. See *Witherspoon v. Illinois*, supra. Certainly, under the more relaxed *Adams* standard enunciated, Ms. Spillane was properly excluded since her views on capital punishment would "prevent or substantially impair the performance of (her) duties as a juror in accordance with (her) instructions and (her) oath." *Wainwright v. Witt*, supra; *Adams v. Texas*, supra. Appellant's second point of error is overruled.

Prospective juror Inez McIntosh initially stated that she could answer "yes" to the special issues but "no" to the death penalty. Further examination reflected her mind-set against both the death penalty and serving on a capital jury:

Q. Are you telling me in each and every capital murder case you would always say 'No' to the death penalty?

A. I would, yes.

\* \* \* \* \* \*

Q. Are you telling me your opposition to the death penalty is so great that you could not serve as a juror in a capital murder case?

A. Yes, that's right.

Q. No matter what the facts are?

A. That's right.

\* \* \* \* \* \*

Q. Are you saying because of your feelings about the death penalty you could not take that oath and abide by that oath?

A. That's right.

\* \* \* \* \* \*

Q. Are you telling me that you would refuse to be a juror in this case?

A. I would if it's capital punishment.

Q. Ma'am?

A. Yes.

After answering the trial judge's questions Ms. McIntosh was also questioned by attorneys for the State and the Defense, but her viewpoints on capital punishment

and on taking the required oath remained the same. Further questions by the court only underscored her personal opposition to the death penalty and taking the oath.

Given the proper degree of deference to the trial court's determination, we conclude from the record that prospective juror McIntosh was properly excused upon challenge for cause based on the *Adams* standard adopted in *Witt*, supra. The trial court did not err in overruling appellant's challenge. *Granviel v. State*, supra; *Carter v. State*, supra; *McCoy v. State*, supra; *Bird v. State*, supra; *Phillips v. State*, supra. Appellant's third point of error is overruled.

In his fourth point of error appellant complains of the exclusion of prospective juror Denise Carcel Morgan. He describes Ms. Morgan as the classic "equivocating juror" and contends that she was unable to make a clear expression of whether or not her views on the death penalty would result in an inability to follow the law.

Ms. Morgan's examination covers eighty-five pages of the record. Initially, she states that only God may decide guilt or innocence and that the possibility of a death penalty would definitely affect her decision. Then she says that she could participate but would reserve judgment before deciding. The court next focuses on her personal feelings on punishment:

Q. Let's talk some more on your feelings on the death penalty. How do you feel about the death penalty?

A. I totally disagree about the death penalty; I do.

\* \* \* \* \* \*

Q. If they were proved to you beyond a reasonable doubt that those answers should be 'yes' could you answer them 'yes' knowing that the result would be the death penalty?

A. No, I couldn't.

\* \* \* \* \* \*

Q. So both decisions life imprisonment or the death penalty are disturbing to you; is that right?

A. Definitely, because I know that it is taking anybody's joy. I know I wouldn't want to be in jail for life.

Q. Are you saying then that you could not make a decision as to guilt or innocence because of your strong feelings?

A. Yes.

Ms. Morgan related to the court that her cousin had been found guilty of murder while Ms. Morgan believed her innocent. This fact added to her strong personal feelings against making any decision or in taking the oath. When questioned further about her duties as a juror, Ms. Morgan again vacilates but ultimately asserts her inability to perform as a juror:

Q. (State's Attorney): If we asked you to take this oath as a juror to follow the law and the evidence and a true verdict render would you refuse to take the oath?

A. Yes, because I don't want to follow man's law.

\* \* \* \* \* \*

Q. Here's my question, it is simply: could you personally ever sit on a jury panel that caused a person to get the death penalty?

A. No.

\* \* \* \* \* \*

Q. If you were on, would you always answer one of these questions 'no' to be sure he got a life sentence?

A. I would answer them 'no' because I definitely wouldn't want to give him death, but that's if (she were to serve). .... I'm not going to argue. I'm not going to break down and give, you know, the death penalty. I just don't want to be a partaker. That's plain and simple. That's the way I feel.

\* \* \* \* \* \*

Q. (Defense Attorney): .... Can you set your feelings aside and can you take that oath as a juror to sit in here as a juror and listen to the evidence and base your decision solely upon the evidence that you hear?

THE JUROR: No, I don't want to set my feelings aside.

\* \* \* \* \* \*

Q. That's, I guess, really what the question boils down to. We know you don't want to take that oath. We know that as you've told us many times.

A. If the Court asks me to I would have to.

\* \* \* \* \* \*

Q. Is what you're telling me then, Miss Morgan, if you did take the oath, if the Judge asked you to, what you're telling me deciding on these three issues then you'd disregard that oath, wouldn't follow it and would automatically answer one or more of those questions 'no' regardless of what the facts proved to you were (indicating)?

A. I stated that the first time, if I was on the jury.

Q. (State's Attorney): Can you take the oath or would you refuse to take it? Put it in your own words, please.

A. Plain and simple I don't want to take it.

Q. All right. And is your feeling about not wanting to take it so strong that you would refuse to take it because of the personal damage it would do to you if you did take it?

A. Yes.

\* \* \* \* \* \*

.... Could you ever in any circumstance answer all three of these questions 'yes' and give somebody the death penalty?

A. I said no earlier.

Q. And is that the way you feel?

A. Yes.

■ In excluding Ms. Morgan, the trial court noted that the prospective juror clearly said that her personal convictions and beliefs prevented her from making a decision at either trial stage regardless of the amount of evidence. Not only was Ms. Morgan opposed to the death penalty but also to life imprisonment. She clearly stated that she could not follow the law upon

which the State is entitled to rely. Even beyond that, she did not want to participate in any manner in the trial. Reluctant to disqualify a juror after a two-hour voir dire, the trial judge nevertheless granted the State's challenge for cause, finding the court had "no choice under the law." We agree with the determination of the trial court. The record makes clear that Morgan's views would prevent or substantially impair the manner in which she carried out her duties in accordance with her oath and instructions. See *Montoya v. State*, supra; *Carter v. State*, supra; *McCoy v. State*, supra; *Bird v. State*, supra. Appellant's fourth point of error is overruled.

In his fifth, sixth, seventh, eighth and ninth points of error the appellant contends that the trial court erred in denying his motion to suppress and allowing into evidence over objection a box of Remington and Peters 9mm cartridges, a pair of tennis shoes, and certain items of clothing which he claims were seized as the product of his illegal arrest. Appellant intially argues that his detention violated his rights under the Fourth Amendment to the United States Constitution and Art. I, § 9 of the Texas Constitution.

Specifically, appellant argues that officers Curtis lacked probable cause for the initial intrusion and that his subsequent detention was based upon a mere inarticulate hunch that he was involved in some sort of criminal activity. Moreover, appellant urges that his acquiescence to accompany the police officers should not be construed as being consensual. See *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The State responds that appellant was seized with probable cause or, in the alternative, the seizure was nevertheless reasonable under the circumstances. After a hearing on appellant's motion, the trial court found the officers' initial stop and detention of appellant was reasonable and proper, and that his subsequent conduct in accompanying the officers

to the scene of the crime where he was subsequently arrested was voluntary in nature.[9]

Circumstances short of probable cause for an arrest may justify a temporary investigation or detention because investigation is a lesser intrusion on personal security than an arrest. *Fatemi v. State*, 558 S.W.2d 463 (Tex.Cr.App.1977). An inarticulable hunch or suspicion that a person has or is committing a crime is not sufficient; a peace officer must have specific and articulable facts which, in light of his experience and personal knowledge, taken together with rational inferences from these facts, would reasonably warrant intrusion of an individual stopped for further investigation. *Schwartz v. State*, 635 S.W.2d 545 (Tex.Cr.App.1982); *McMillan v. State*, 609 S.W.2d 784 (Tex.Cr.App.1981). However, an officer may briefly stop a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information. See *Mays v. State*, 726 S.W.2d 937 (Tex.Cr.App.1987); *Gearing v. State*, 685 S.W.2d 326 (Tex.Cr.App.1985); *Johnson v. State*, 658 S.W.2d 623 (Tex.Cr.App.1983).

Turning to the case before us, we find that the officers were justified in their initial detention of appellant. Appellant was first observed halfway down a dimly-lit alleyway between two buildings. His reaction upon seeing the police vehicle was to turn around and walk rapidly in the opposite direction. Officers Curtis drove after him and were able to monitor his demeanor and physical appearance before stopping him. Both officers testified that appellant was "sweating profusely," was dirty and had torn his pants to the extent that his underwear was visible. Discovery of such an individual in the general area where a crime has been reported supports at least a brief investigative detention for purposes of gathering further information.

---

**9.** Although the trial judge stated on the record that she would file findings of fact and conclusions of law in this case, perusal of the record fails to disclose that such was done. Before making the findings on the record that appellant's constitutional rights were not violated by the officers' conduct, the trial judge did summarize the pertinent facts surrounding the detention and arrest, supra.

See *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (Tex.Cr.App.1968).

After being stopped the appellant denied any knowledge of a shooting and told officers that he had been shopping in the Weingarten's store. The investigating officers were understandably suspicious of him due to the fact that appellant was not carrying any grocery bags and because of the incongruity of his physical appearance and demeanor with that normally associated with one who has concluded a shopping trip. However, given the lack of specifics known to the officers regarding the alleged crime, we cannot say that the officers had sufficient information at this time to directly connect appellant with the alleged crime, so that if appellant is correct in his claim that he was arrested at this point, we must find that arrest to be invalid. See *Daniels v. State,* 718 S.W.2d 702 (Tex.Cr.App.1986) and *Johnson v. State,* supra.

▇▇▇▇ An individual is arrested when he has been actually placed under restraint or taken into custody. Art. 15.22 V.A.C. C.P. An arrest is complete when a person's liberty of movement is restricted or restrained. *Hoag v. State,* 728 S.W.2d 375 (Tex.Cr.App.1987); *Brewster v. State,* 606 S.W.2d 325 (Tex.Cr.App.1980); *Hardinge v. State,* 500 S.W.2d 870 (Tex.Cr.App.1973). A person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the stop or intrusion, a reasonable person would have believed he was not free to leave. *Florida v. Royer,* supra. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (rehearing denied 448 U.S. 908, 100 S.Ct. 3081, 65 L.Ed.2d 1138); *Dancy v. State,* 728 S.W.2d 772 (Tex.Cr.App.1987); *Russell v. State,* 717 S.W.2d 7 (Tex.Cr.App.1986); *Clark v. State,* 627 S.W.2d 693 (Tex.Cr.App.1982). However, where a person voluntarily accompanies investigating police officers to a certain location, and he knows or should know that the police officers suspect that he may have committed or may be implicated in committing a crime, that person is not "restrained" or "in custody" as contemplated by Art. 15.22, supra, so that his Fourth Amendment or Art. I, § 9 rights are implicated. See *Dancy v. State,* supra. Once the circumstances show that the person is acting upon the invitation, urging or request of police officers, and not the result of force, coercion or threat, the act is voluntary and the person is not then in custody. See *Shiflet v. State,* 732 S.W.2d 622 (Tex.Cr.App.1985).

In *Shiflet v. State,* supra, this Court considered the question of custody in terms of the Fifth Amendment and *Miranda,* supra. More recently, in *Dancy v. State,* supra, we considered the question of custody *vis a vis* that appellant's claim of an illegal arrest under the Fourth Amendment and decided:

Where a person voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated in committing the crime, we are unable to hold that under the circumstances such a person is restrained of his freedom of movement. Under those circumstances, he is not in custody. See and cf. *Ussery v. State,* [651 S.W.2d 767, 770 (Tex.Cr.App.1983)] supra; *Martinez v. State,* 635 S.W.2d 629 (Tex.App.—Austin 1982); *Stone v. State,* 583 S.W.2d 410 (Tex.Cr.App.1979); *Penry v. State,* 691 S.W.2d 636 (Tex.Cr.App.1985); *Gregg v. State,* 667 S.W.2d 125 (Tex.Cr.App.1984); *Gutierrez v. State,* 708 S.W.2d 937 (Tex. App.—Corpus Christi, 1986); *Mallard v. State,* 708 S.W.2d 27 (Tex.App.—Texarkana 1986). *Dancy v. State,* 728 S.W.2d at 778.

In the instant appeal, appellant urges this Court to construe his acquiescence in accompanying the investigating officers as being non-consensual because of the officers "show of authority." However, a review of the record clearly demonstrates that no force, threats or coercion, explicit or implicit, was used to entice appellant's entry into the police car. Both officers' uncontroverted testimony was that Officer James Curtis asked appellant if he would mind getting into the car and riding around

the parking lot to locate the scene of the alleged shooting. Appellant replied that he would not mind. It was explained to him that he was not under arrest, but that it was departmental policy to check anyone riding with an officer for weapons. The frisk was performed quickly, without appellant being asked to empty his pockets. Appellant entered the rear of the vehicle and rode around the lot without benefit of supervision by an officer riding with him. Nor was appellant handcuffed or restrained in any unusual manner.[10] The evidence revealed that prior to the eyewitness' description being broadcast, appellant was free to leave and was treated as if he was free to leave. *Penry v. State*, supra.

Findings by the trial court should not be disturbed, absent a clear abuse of discretion. From the totality of circumstances there was ample evidence to support the finding that appellant was not arrested or illegally detained by Officers Curtis as contended. See *Dancy v. State*, supra. We find that the officers were justified in initially detaining appellant in order to preserve the status quo momentarily while obtaining more information. In light of the knowledge that a shooting had recently occurred, the appellant's appearance and the implausibility of his explanation for his presence in the area took on special significance. See *Perez v. State*, 548 S.W. 2d 47 (Tex.Cr.App.1977). Moreover, appellant's consent to accompany the investigating officers, even in light of his own articulated knowledge that he might be criminally implicated, vitiates his contention that he was in any way officially restrained in his freedom of movement so as to be "in custody." See *Shiflet v. State*, supra; *Dancy v. State*, supra. We find that the State met its burden of proving the legality of its

conduct in the matter of appellant's warrantless detention and subsequent arrest based upon eyewitness identification. See *LaLande v. State*, 676 S.W.2d 115 (Tex.Cr. App.1984); *Hooper v. State*, 533 S.W.2d 762 (Tex.Cr.App.1976).

The investigative stop and detention of appellant being proper under either the Fourth Amendment or Art. I, § 9 of the Texas Constitution, see *Brown v. State*, 657 S.W.2d 797 (Tex.Cr.App.1983), with his arrest following identification as the assailant at the scene of the shooting, we also do not find that the subsequent "fruits" of that seizure, a pair of tennis shoes, certain items of clothing, and a box of 9mm cartridges, were improperly admitted into evidence at trial.[11] See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Cf *Rodriguez v. State*, 578 S.W.2d 419 (Tex.Cr.App.1979); *Brantley v. State*, 522 S.W.2d 519 (Tex.Cr.App. 1975).

Appellant's fifth, sixth, seventh, eight and ninth points of error are overruled.

In his tenth point of error appellant argues that the evidence is insufficient to support his conviction under V.T.C.A., Penal Code., § 19.03, supra. He contends that his identification as the gunman was highly suggestive due to the fact that the police transported appellant to the scene of the crime, and that an improper lineup took place at the station house. He argues that testimonial evidence relating to the gunman's clothing amounts only to a tenuous identification. Finally, it is claimed that the physical evidence does not conclusively tie appellant as gunman to the shooting beyond a reasonable doubt.

The standard for appellate review of the sufficiency of the evidence is the

10. The rear doors to the car could not be opened from the inside. This fact in and of itself does not in our opinion give rise to an argument that appellant was "restrained" in a custodial manner since he voluntarily entered the vehicle in the first place.

11. Almost as an aside, appellant argues that his consent to search his residence was tainted since he was illegally detained. See *Florida v. Royer*, supra. In *Royer*, the police exceeded the bounds of a proper investigative stop whereas in

the instant case the brief initial stop was followed by appellant voluntarily accompanying the officers. However, even if the initial stop or detention tainted the subsequent arrest, the intervening circumstances of appellant's subsequent *Miranda* warnings, telephone conversations and written consent to search his residence and take various hair samples would have removed the taint of illegality from the fruits of his detention.

same whether the case is based upon direct or circumstantial evidence. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). See also *Mattias v. State*, 731 S.W.2d 936 (Tex.Cr.App. 1987), and the cases cited therein; *Scott v. State*, 732 S.W.2d 354 (Tex.Cr.App.1987), and the cases cited therein; *Rector v. State*, 738 S.W.2d 235 (Tex.Cr.App. 1986); *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr. App. 1986). In both direct and circumstantial evidence cases, the reviewing court will look at *all* the evidence, both proper and improper, in consideration of that issue. *Dunn v. State*, 721 S.W.2d 325 (Tex.Cr. App.1986); *Scott v. State*, supra, citing *Houston v. State*, 663 S.W.2d 455 (Tex.Cr. App.1984).

In the instant case the record reflects that there were several eyewitnesses to the shooting. Donald Austin, Joe Cunningham and Flor Monzon all testified that the gunman was a black male wearing dark pants and a dark shirt with white lettering. Mary Norton and Jerry Thompson testified in addition that the gunman wore tennis shoes. Other witnesses testified that the gunman had a white cloth or covering over his face. There was testimony from several sources that a struggle occurred between the deceased and the gunman, and that the gunman, after separating himself from the woman, reached back and fired one or two shots. The evidence is uncontroverted that the cause of death was a gunshot wound to the neck.

Several witnesses said that the gunman stumbled or fell as he left the scene with purse and gun. Bruce Norton pursued the gunman and discovered the purse at a dumpster by or behind which witnesses testified the gunman crouched or paused before dropping some item. Norton also saw the gunman fling a white object, later determined to be a previously-fired 9mm pistol covered by a white cloth, into some bushes. A cartridge case found a short distance from the body of the deceased was found to have been fired from the gun, and a bullet fragment taken from the body was consistent with that of the unfired ammunition found in the clip of the gun and at appellant's residence. The white cloth contained minute facial hair samples consistent with appellant's pigmentation. In addition, a plaster cast made of a footprint found in the line of the gunman's flight demonstrated more than a casual likeness to the tennis shoe worn by appellant in size, pattern and descriptive characteristics.

When approached by investigating officers James and Margie Curtis, appellant's appearance and story were unusual and contradictory. He told the officers that he had been in the Weingarten's store shopping, but had no groceries and no wallet. Accepting appellant's own story he was, as witnesses testified, inside an air-conditioned store, but was sweating profusely as if having just engaged in some strenuous activity such as running. He was disheveled, clothes stained and ripped, traces of fresh soil on his arms and legs.

Turning to appellant's specific claims, we note first that the trial court suppressed the potentially suggestive lineup identification, and second, that the gunman's description was given to police at the scene within a very short time after commission of the crime and *before* the eyewitnesses viewed appellant as he sat in the rear seat of the Curtis patrol car. At trial, LaVerne Morton, Joe Cunningham, Flor Monzon, Donald McDaniel, Mary Norton and Bruce Norton all testified that appellant was the gunman. They explained that their identification was based on either his clothing, his build, or both. Each witness testified that their identification was the result of viewing the gunman at or near the scene of the crime. The fact that a witness cannot give a positive identification of another person goes to the weight of his testimony, not to its admissibility; therefore, the lack of a positive identification is a jury issue. *Moore v. State*, 700 S.W.2d 193 (Tex.Cr. App.1985); *Garza v. State*, 633 S.W.2d 508 (Tex.Cr.App.1982); *Valenciano v. State*,

511 S.W.2d 297 (Tex.Cr.App.1974). A clothing description, combined with other evidence regarding the circumstances of an offense has been held to be sufficient in a circumstantial evidence case. See *Bonner v. State*, supra; *Garza v. State*, supra.

■■■ Here, the State proved other circumstances linking appellant with the commission of the crime. Through testimony and physical evidence it was shown that appellant bought a box of ammunition similar to cartridges found in the pistol and near the body before the date of the shooting. In *Schroeder v. State*, 543 S.W.2d 382 (Tex.Cr.App.1976) the defendant's possession of the same type of ammunition as that used in the shooting, when combined with other evidence, was held to be sufficient to prove identity. There is also the link of the plaster cast comparison with appellant's own tennis shoes. A shoe print comparison less than positive may still be sufficient to prove identity when combined with other evidence. See *Carlisle v. State*, 549 S.W.2d 698 (Tex.Cr.App.1977).

In addition, the State presented evidence showing the appellant's presence near the scene at least two hours before and within ten or fifteen minutes after the shooting, as well as his apparent flight from the Weingarten's parking lot at the approximate time of the shooting. These are also circumstances which, if standing alone, might not be sufficient to sustain a conviction. Nevertheless, they are factors from which an inference of guilt may be drawn. See *Harris v. State*, 645 S.W.2d 447 (Tex.Cr.App.1983); *Valdez v. State*, 623 S.W.2d 317 (Tex.Cr.App.1981); *McWherter v. State*, 607 S.W.2d 531 (Tex.Cr.App.1980).

We agree with the State that appellant's post-arrest conduct in attempting to suppress evidence by spitting on himself and rubbing his hands together after officers explained why they wished to conduct a trace metals test is also probative of guilt. See *Rodriguez v. State*, 577 S.W.2d 491 (Tex.Cr.App.1979); *Maddox v. State*, 288 S.W.2d 780 (Tex.Cr.App.1956).

■■■ In circumstantial evidence cases it is not necessary that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Russell v. State*, 665 S.W. 2d 771 (Tex.Cr.App.1983); *Vaughn v. State*, 607 S.W.2d 914 (Tex.Cr.App.1980); *Flores v. State*, 551 S.W.2d 364 (Tex.Cr. App.1977). The cumulative evidence presented here was sufficient for the rational trier of fact to find all the essential elements of capital murder under § 19.03(a)(2), supra, beyond a reasonable doubt. See *Jackson v. Virginia*, supra. See also *Fierro v. State*, supra. *Rector v. State*, supra; *Russell v. State*, supra; *O'Pry v. State*, 642 S.W.2d 748 (Tex.Cr. App.1981); *Brasfield v. State*, supra. Because, after viewing the evidence in the light most favorable to the verdict, there is no other outstanding reasonable hypotheses, we find that the evidence is clearly sufficient to support appellant's conviction under § 19.03, supra. *Russell v. State*, supra; *Banks v. State*, 643 S.W.2d 129 (Tex.Cr.App.1983); *O'Pry v. State*, supra. Appellant's tenth point of error is overruled.

Appellant asserts in his eleventh and twelfth points of error that the trial court reversibly erred in permitting the prosecutor, over objection, to introduce into evidence the written statement of witness Jerry Thompson, since such evidence constituted hearsay and improper bolstering of the witness. The State responds that the statement was admissible under Art. 38.24, V.A.C.C.P.

On direct examination the prosecutor made no reference to Thompson's written statement to police. It was elicited from the witness that the gunman was wearing some type of dark clothing and had a white scarf or cloth across his face, so that Thompson could not positively identify appellant at the scene of the shooting when given the opportunity to view appellant sitting in the rear of the police car. On cross-examination defense counsel questioned Thompson as to his testimony that he had walked over to the dumpster across the street from the service station and had picked up a purse, but had put the purse

back down after "some man" told him to do so. The questioning then continued as to the identity of this other individual, and it was established that the unnamed man was elderly, "medium height and skinny." Apparently, with the strategy to discredit the witness, defense counsel then read from a portion of the witness' statement given to police which dealt with the witness' description of the gunman at the scene. Cross-examination was concluded after Thompson admitted he told the police at the scene that appellant was "not the man."

On redirect the prosecutor had the witness identify the statement in question and offered the statement into evidence in its entirety over objection that the statement was hearsay and improperly bolstered the witness' testimony. The trial court, outside the jury's presence, ruled that the defense had opened the door for introduction of the rest of the statement by reading only a portion of that statement before the jury. The trial judge, concerned that the jury might be left with a "misapprehension", overruled appellant's objection and allowed the statement to be introduced in its entirety.

We first turn our attention to the appellant's contention that Thompson's statement was inadmissible hearsay. "Hearsay" is defined as an out-of-court statement offered for the truth of the matter asserted. *Phenix v. State*, 488 S.W.2d 759 (Tex.Cr.App.1972), at 761, citing McCormick, J., Evidence, § 225 at 460; see also *McKay v. State*, 707 S.W.2d 23 (Tex.Cr. App.1985).

■ An out-of-court statement offered for the purpose of *showing what was said* rather than the truth of the matter stated therein does not, however, constitute hearsay. *McKay v. State*, supra; *Porter v. State*, supra. See also *Nixon v. State*, 587

S.W.2d 709 (Tex.Cr.App.1979); *Gholson v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976).

■ In the instant case, the statement was introduced, not to prove the truth of the matter asserted, but to provide the context in which a particular statement was made so as to alleviate the possibility of misapprehension by the jury. Reading the statement as he did, following on the questions concerning both the gunman and the individual who told Thompson to replace the purse where he had found it, defense counsel clearly could have sowed some confusion in the jury members' minds.

We also note that Art. 38.24, V.A.C.C.P. provided:[12]

> When part of an act, declaration or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence.

■ Art. 38.24, supra, was meant to be used to guard against the possibility of confusion, distortion or false impression that could rise from use of a portion of an act, writing, conversation, declaration or transaction out of proper context. See *Saunders v. State*, 572 S.W.2d 944 (Tex.Cr. App.1978); *Roman v. State*, 503 S.W.2d 252 (Tex.Cr.App.1974). Since defense counsel first made reference to the witness' statement by reading from the second page of that document, it was proper under Art. 38.24, supra, for the State to allude to and introduce into evidence other portions of that statement contradicting or placing

12. Art. 38.24, supra, was repealed by the Texas Rules of Criminal Evidence effective September 1, 1986 and is replaced by Tex.R.Crim.Evid.R. 107: Rule of Optional Completeness:

When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same

subject between the same parties may be given. When a detailed act, declaration, conversation, writing or recorded statement is given in evidence, any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence. 'Writing or recorded statement' includes depositions.

into proper context the impression left by defense counsel. See *Davis v. State,* 651 S.W.2d 787 (Tex.Cr.App.1983); *Cerda v. State,* 557 S.W.2d 954 (Tex.Cr.App.1977).[13] There being no difference in the meaning or effect between old Art. 38.24 and new Rule 107, both supra, in the case at bar, we find the trial court properly admitted the statement of witness Thompson.

 Moreover, the evidence did not constitute improper bolstering. "Bolstering" occurs when one item of evidence is improperly used by a party to add credence or weight to some earlier *unimpeached* piece of evidence offered by the same party. *McKay v. State,* supra, at 33 citing as example *Pless v. State,* 576 S.W.2d 83 (Tex. Cr.App.1978); *Frison v. State,* 473 S.W.2d 479 (Tex.Cr.App.1971); *Acker v. State,* 421 S.W.2d 398 (Tex.Cr.App.1967); *Lyons v. State,* 388 S.W.2d 950 (Tex.Cr.App.1965). The witness' statement at issue does not fall within this rule. Defense counsel had at least attempted to impeach the testimony of Thompson by directly reading from an isolated and later portion of the witness' statement regarding the incident. If not impeached, the testimony of the witness was clearly clouded by appellant's cross-examination. See *Smith v. State,* 595 S.W.2d 120 (Tex.Cr.App.1980); see also *Davis v. State,* supra; *Proctor v. State,* 503 S.W.2d 566 (Tex.Cr.App.1974). Appellant's eleventh and twelfth points of error are overruled.

In his thirteenth point of error appellant contends that the trial court erred in admitting an oral statement into evidence over his hearsay objection. The record reflects that the State, through Officer Cook, established that a group of bystander-witnesses observed appellant sitting in the rear of the Curtis patrol car after the officers arrived at the crime scene. Cook was asked whether he had heard "anybody say anything with regard" to appellant. After defense counsel objected on hearsay grounds,

the jury was retired. Stating that it was appropriate that the record "be clear" on the issue, the trial judge reiterated the points made in an earlier unrecorded bench conference, those being that the defense intended to raise the issue of probable cause for the arrest (and attendant fruits of the arrest) before the jury and that the State felt the evidence at issue was relevant to the issue of probable cause and was offering the statement not for the truth of the matter contained therein, but to show that the statement was made in the officer's presence.

Both counsel agreed as to the issue earlier discussed off the record, but defense counsel was concerned that allowing the unknown citizen's statement, "That's him. I recognize the clothing", into evidence would deprive appellant of his right of cross-examination, and the defense requested that a limiting instruction be given. The trial court overruled appellant's objection and ruled that the statement was admissible to show probable cause for the arrest and as "res gestae of the arrest." The jury was returned to the courtroom and clearly heard the remarks, again over appellant's objection.

At the close of trial, appellant chose not to renew his request that the jury decide the issue of probable cause. In point of fact, counsel affirmatively stated for the record that he had no objections to the charge. The charge contained no instructions requiring the jury to decide the legality of the appellant's arrest.

 Hearsay evidence is accepted upon the question of probable cause to arrest or search, where the issue is submitted to the jury pursuant to Art. 38.23, V.A.C.C.P. *LaLande v. State,* supra; *Murphy v. State,* 640 S.W.2d 297 (Tex.Cr.App.1982); *Adams v. State,* 552 S.W.2d 812 (Tex.Cr. App.1977); *Hutchinson v. State,* 509 S.W. 2d 598 (Tex.Cr.App.1974). Upon proper re-

---

13. Even if admission of Thompson's statement was error, the same is not reversible unless shown to be prejudicial to appellant. *Urick v. State,* 662 S.W.2d 348 (Tex.Cr.App.1984). Since the same evidence was elicited without objection through testimony on direct examination, the error, if any, would be harmless. See *Thomas v. State,* supra. We also fail to see a reasonable possibility that the statement contributed to the conviction. *Thomas v. State,* 701 S.W.2d 653 (Tex.Cr.App.1985).

quest, an instruction should be given limiting the jury's consideration of such evidence to the narrow issue for which it is admissible. In such a case, a defendant's hearsay objections are properly overruled. See *Murphy v. State*, supra.

██ In the instant case, defense counsel informed the trial court of his intention to place the issue of probable cause for appellant's seizure before the jury. Allowing the oral statement into evidence, the trial court nevertheless required the State to call the jury's attention to the fact that the evidence was admissible only in a limited context. The fact that appellant subsequently failed to request a proper charge and agreed to the charge as given waives his contention on appeal. The trial court properly allowed the oral statement into evidence for the limited purpose outlined above. *Murphy v. State*, supra.

██ Moreover, if a fact to which objected-to hearsay relates is sufficiently proven by other competent and unobjected to evidence, the admission of the hearsay is properly deemed harmless and does not constitute reversible error. *Anderson v. State*, supra. The record reflects that Flor Monzon, without objection, also testified she told officers, "That's him", after viewing appellant in the squad car. Appellant's thirteenth point of error is overruled.

Appellant suggests in his fourteenth point of error that the trial court committed reversible error by admitting LaVerne Morton's identification testimony because the witness' in-court identification of appellant was tainted by suggestive out-of-court lineup procedures.

As earlier noted, the trial court granted appellant's Motion to Suppress Identification based upon an impermissibly suggestive lineup held during the late hours of August 10th.[14] The court, however, expressly denied appellant's further request to suppress in-court identification, explaining that "virtually all of the persons who testified described fairly good detail of the person that they saw." She then cautioned the State to be very careful in presenting in-court-identifications since none of the witnesses, except for Mr. Koivula,[15] testified that they had seen the gunman's face. The court suggested that the identification witnesses couch their responses in such terms as "he appears to be" or "he looks like" (the gunman).

At trial, LaVerne Morton was called during the State's case-in-chief and described what he saw of the murder. The prosecutor then asked Morton to point out the person he "saw back on August 10, 1983 struggling with this woman." Morton responded by identifying appellant who was sitting at counsel table. No objection was lodged by appellant to this procedure.

Following Morton's positive identification, the prosecutor questioned the witness as to the specifics of his identification of appellant. The record reflects that, both during this latter phase of direct examination and on cross-examination, it was made clear that Morton's identification was based upon the gunman's clothing and build rather than facial characteristics.

After the witness was excused and the court called a luncheon recess, defense counsel registered his first objection to Morton's identification testimony and moved for a mistrial. The trial court pointed out that the objection was untimely and ruled against appellant, stating for the record that there was no evidence before her indicating that Morton's in-court identification was based on the suppressed lineup. She also noted that appellant was not harmed by the witness' testimony since the evidence before the jury clearly reflected that Morton had not seen the gunman's face. Appellant now argues that under

---

14. As well as finding the lineup impermissibly suggestive, the trial court also based its ruling on the State's failure to prove that no charges had been filed at the time the lineup took place, so that the State failed to show that appellant's right to have an attorney present had not been violated. See *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967).

15. Mr. Koivula testified at the pretrial hearing but for reasons better left to the State to explain, was not called as a witness at trial.

*Martinez v. State,* 437 S.W.2d 842 (Tex.Cr. App.1969), the error in allowing the identification testimony was preserved by the adverse ruling on his Motion to Suppress. In the alternative, appellant would have this Court review the unassigned error "in the interests of justice" pursuant to Art. 40.09, V.A.C.C.P. and *Armstrong v. State,* 550 S.W.2d 25 (Tex.Cr.App.1977).

■ It is settled that when a pre-trial motion to suppress evidence is overruled, the accused need not subsequently object to the admission of the same evidence at trial in order to preserve error. *Gearing v. State,* supra; *Ebarb v. State,* 598 S.W.2d 842 (Tex.Cr.App.1980); *Riojas v. State,* 530 S.W.2d 298 (Tex.Cr.App.1975); *Harryman v. State,* 522 S.W.2d 512 (Tex.Cr.App.1975).

In the instant case, appellant's motion to suppress in-court identification of the gunman was not granted, the trial court finding that "virtually all of the persons who testified described fairly good detail of the person that they saw." We find that appellant preserved his complaint as to the in-court identification.

The Supreme Court in its trilogy of *United States v. Wade,* supra; *Gilbert v. California,* supra; and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), was concerned about the effect of pretrial identification procedures upon eyewitnesses' subsequent trial testimony. It was decided that if the lineup occurred after initiation of formal adversarial proceedings or where the confrontation was found to be "so unnecessarily suggestive and conclusive to irreparable mistaken identification" that it would deny an accused due process of law, an in-court identification would not be allowed unless it was shown that the identification had an origin independent of the challenged confrontation, as viewed by the totality of circumstances.

■ In the present case we believe that Morton's identification of appellant was sufficiently reliable under the facts and circumstances presented so as to be admissible. Prior to viewing the lineup Morton described the gunman as a black male wearing dark clothes, between 5'8" and 5'10", stocky in build, and bowlegged. While it is true that Morton was not able to view the facial features of appellant at the time of the offense and could give police only a general description of the gunman, such matters go to the weight and not the admissibility of the evidence. See *Garza v. State,* supra; *Valenciano v. State,* supra; *Martinez v. State,* 507 S.W.2d 223 (Tex.Cr. App.1974).

The record also reflects that Morton testified his identification of appellant was based on both his observations during the robbery and his viewing of appellant in the lineup. Since one basis for his identification of appellant was clothing and build, as viewed at and near the scene of the offense, the record supports the trial court's finding of an independent basis for the identification.

Moreover, while Morton did give a positive in-court trial identification, it cannot be claimed that his direct testimony misled the jury. Just as in *Garza v. State,* supra, the record here reflects that the jury was made aware of the basis for Morton's identification, including the fact that he could not positively identify appellant by facial characteristics. The jury had before it all the relevant information concerning the identification and it was the jury's duty to determine the credibility of witness Morton. See *Watkins v. Sanders,* 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981). We do not find the identification evidence complained of to have been irreparably tainted.

We also note that the jury heard other similar identification testimony. Morton's testimony, when viewed in its entirety, was cumulative of other similar identification testimony and any error in admission of the identification evidence was harmless. See *Williams v. State,* 477 S.W.2d 885 (Tex.Cr. App.1972); *Mason v. State,* 472 S.W.2d 787 (Tex.Cr.App.1971). Appellant's fourteenth point of error is overruled.

In his fifteenth point of error appellant contends the trial court erred in refusing to grant a mistrial after a State's witness mentioned the pretrial lineup, contrary to

the trial court's admonition upon suppressing any evidence of that lineup.

The record reflects that Officer J.K. Jones testified during the State's case-in-chief and the following exchange occurred:

Q. Now, the next thing that happens, start from the place where the defendant is handcuffed behind his back there and you just turned on the overhead light. You don't see any results in the waistline on the defendant. What happens next?

A. Okay. Well, at that time I was through with my test due to the fact that there was nothing for me to draw or diagram and so I told Anderson, 'Well, I'm basically through with him,' and they requested that I take some pictures of him up there in the office, just to show his hand and some—to show the cut on his hand and how his pants were ripped and what he was wearing and also at that time they requested that I come down, they were going to run a *lineup*—

Q. Excuse me just a moment. The pictures that you took of him, was there a handcuff, a picture of him handcuffed behind his back?

A. Yes, there was. (Emphasis added)

The appellant made no objection to the question or to the witness' response. The record reflects that neither the prosecutor nor the witness made any further reference to the lineup, although the direct testimony continued for some time. After passing the witness, the prosecutor requested an opportunity to instruct the witness, prior to cross-examination, not to mention the lineup. It is at this time that defense counsel objected for the first time to the officer's reference to a lineup. He did not request an instruction to disregard, claiming such an admonishment would "heighten the effect" of the testimony. The trial court denied appellant's request for a mistrial, but ordered the State not to elicit testimony as to the lineup.

Appellant cites no authority for his proposition that the trial court's refusal to grant a mistrial should be held to constitute reversible error, but merely speculates that he was harmed by the impression left by the witness' response.

■ It is clear from the record that the witness' response was not invited or encouraged by the prosecution. Any error in asking an improper question or in admitting improper testimony may be generally cured or rendered harmless by a withdrawal of such testimony and an instruction to disregard. . *Guzmon v. State*, 697 S.W.2d 404 (Tex.Cr.App.1985); *Williams v. State*, 643 S.W.2d 136 (Tex.Cr.App.1983). This rule also extends to curing a violation of a granted motion in limine. *May v. State*, 738 S.W.2d 261 (Tex.Cr.App.1987). The exception to this general rule occurs where it appears that the question or the evidence or testimony admitted is "clearly calculated to inflame the minds of the jury and is of such character" as to suggest the impossibility of withdrawing the impression produced on their minds. *Guzmon v. State*, supra, citing *Carter v. State*, 614 S.W.2d 821 (Tex.Cr.App.1981); *Cavender v. State*, 547 S.W.2d 601 (Tex.Cr.App.1977); *Boyde v. State*, 513 S.W.2d 588 (Tex.Cr.App.1974); *White v. State*, 444 S.W.2d 921 (Tex.Cr.App.1969).

■ Here, the single reference to *a* lineup reflects no indirect or direct connection to appellant such as to "inflame the minds of the jury." *Guzmon v. State*, supra. After the unsolicited response was given, the prosecutor quickly moved to other areas of examination without dwelling upon or emphasizing the witness' answer. The fact that a lineup was held was not repeated during later stages of trial. Viewed in the context in which it was given, the comment as to a lineup could have referred to any case in which the officer was involved. We fail to see how the single, inadvertent reference harmed appellant, especially in light of the other evidence against him. See *Williams v. State*, supra. We are therefore unable to state that there is a reasonable possibility that the unresponsive answer of Officer Jones affected the result at either stage of trial. See *Williams v. State*, supra; e.g. *Clemons v. State*, 605 S.W.2d 567 (Tex.Cr.App. 1980).

Even assuming that the testimonial response violated the court's instructions as to a pretrial motion, any error could have been cured by appellant's timely objection and request for instruction. Contrary to appellant's assertion that he strategically refrained from objecting at the time the reference was made, it would have been relatively easy for appellant to lodge an objection and bring up the matter outside the jury's presence. By failing to object and request an instruction to disregard the witness' statement, appellant has waived any error. *May v. State*, supra. Point of error fifteen is overruled.

Appellant next contends in his sixteenth point of error that the trial court improperly denied his request for a jury instruction on the lesser included offense of felony murder. He argues that, because the evidence shows that a struggle took place between the gunman and the deceased, "a jury could deduce that during the struggle, perhaps Complainant had grabbed the gun," rather than appellant having the intent to kill the deceased.

Under § 19.03, supra, if a jury does not find beyond a reasonable doubt that a defendant is guilty of capital murder, he may still be convicted of murder or any other lesser included offense. See Tex.Penal Code, § 19.03(c). The lesser included offenses include all forms of criminal homicide, see *Brooks v. State*, 548 S.W.2d 680 (Tex.Cr.App.1977) as well as any of the specifically enumerated underlying felonies listed under § 19.03(a)(2). See *Broussard v. State*, 642 S.W.2d 171 (Tex.Cr.App.1982).

In *Aguilar v. State*, 682 S.W.2d 556 (Tex.Cr.App.1985), this Court adopted the two-prong test set forth in *Royster v. State*, 622 S.W.2d 442 (Tex.Cr.App.1981) for determining whether a jury must be charged on a lesser included offense. It must first be determined that the lesser included offense is included within the proof necessary to establish the offense charged. Second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser included offense. See also *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App.1986); *Thomas v.*

*State*, supra; *Rogers v. State*, 687 S.W.2d 337 (Tex.Cr.App.1985).

Art. 37.09, V.A.C.C.P., provides in pertinent part:

An offense is a lesser included offense if:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged, . . . .

As applied to this case, the elements of felony murder found under V.T.C.A. Penal Code, § 19.02(a)(3) are:

1. a person
2. committing or attempting to commit a robbery,
3. who in the course of and in furtherance of the commission or attempt,
4. commits or attempts to commit an act clearly dangerous to human life,
5. that causes the death of an individual

Whether an offense bears such a relationship to the offense charged so as to constitute a lesser included offense must be made on a case-by-case basis according to the particular facts involved. See *Santana v. State*, supra; *Broussard v. State*, supra; *Ex Parte McClelland*, 588 S.W.2d 957 (Tex.Cr.App.1979). With respect to the instant case, felony murder is a lesser included offense of capital murder, the only difference between the two crimes being the culpable mental state of the criminal actor. In capital murder, there must exist an intent to kill, while in felony murder the actor must only have the intent to commit the underlying offense, here the robbery of Janet Caldwell. See *Lamb v. State*, 680 S.W.2d 11 (Tex.Cr.App.1984); *Garrett v. State*, 573 S.W.2d 543 (Tex.Cr.App.1978); *Rodriguez v. State*, 548 S.W.2d 26 (Tex.Cr.App.1977). The first step of the *Aguilar* test is established.

The remaining question is whether there is evidence that appellant, if guilty, is not guilty of the charged capital offense, but only of the lesser offense. In deciding this issue, we consider all of the evidence raised at trial from any source. *Thomas v. State*, supra; *Santana v. State*, supra; *Lugo v. State*, 667 S.W.2d 144 (Tex.Cr.App.1984).

The appellant did not testify at trial, nor did the defense offer any testimony which might reasonably have raised an inference that he had the intent to rob but not to kill.

The evidence shows that after struggling with the deceased over possession of her purse, appellant either pushed the deceased backwards or wrenched free himself and stepped backwards. According to eyewitnesses, his next action was to reach back, raise and level the gun at the deceased, and shoot her in the throat at a range between 12 and 24 inches. There was no evidence that the deceased had her hand on the gun when it was fired, as might be reflected by the presence of powder burns on her hands. The manner of the shooting, as well as the location of the wound and proximity of the weapon when fired, demonstrate an intent to kill the struggling, uncooperative victim. In addition, the evidence connects appellant with the 9mm pistol used in the murder. If a deadly weapon, such as pistol, is used in a deadly manner, an intent to kill is presumed. *Jackson v. State*, 548 S.W.2d 685 (Tex.Cr.App.1977) and cases cited therein. Thus, we find that the evidence did not raise the issue of felony murder so as to entitle appellant to the requested instruction, nor was an instruction mandated simply because in proving its case, the State also proved all the elements of the lesser offense. Appellant's sixteenth point of error is overruled.

Appellant next contends that his rights under the Fifth and Fourteenth Amendments of the U.S. Constitution, and under Art. I, § 10 of the Texas Constitution, as well as his statutory rights under Art. 38.-08, V.A.C.C.P. were violated by the prosecutor's comment during final argument on his failure to testify. He claims that the trial court reversibly erred in not granting his motion for mistrial based upon those alleged comments.

During the prosecutor's closing argument at the guilt-innocence stage of trial, he suggested to the jury that appellant could have but did not use, "the power of subpoena" to bring in witnesses who could testify as to how appellant's pants became torn at work. Defense objection was sustained, the jury was instructed to disregard the prosecutor's comment, but appellant's motion for mistrial was denied. The prosecutor continued, saying that if he was the defense, he would investigate appellant's shopping alibi and bring in Weingarten's store employees to testify. Again, defense counsel objected. Outside the jury's presence, the court explicitly found no inference in the prosecutor's remarks with respect to appellant's failure to testify, but sustained the objection, admonished the State to cease further discussion with respect to appellant having any burden of proof, brought the jury back in and instructed them both to disregard the prosecutor's remarks and as to the State's burden of proof in the case.

A prosecutor's comment on a defendant's failure to testify offends both our State and Federal Constitutions as well as Art. 38.08, supra.[16] See *Losada v. State*, 721 S.W.2d 305 (Tex.Cr.App.1986); *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr. App.1985); *Banks v. State*, supra; *Nickens v. State*, 604 S.W.2d 101 (Tex.Cr.App.1980); *Bird v. State*, 527 S.W.2d 891 (Tex.Cr.App. 1975). For a statement to constitute a comment on the failure to testify, the language of such a statement must be either manifestly intended, or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. *Losada v. State*, supra; *Cannon v. State*, supra; *Lee v. State*, 628 S.W.2d 70 (Tex.Cr.App.1982); *Angel v. State*, 627 S.W.2d 424 (Tex.Cr. App.1982); *Griffin v. State*, 554 S.W.2d 688 (Tex.Cr.App.1977). For an indirect comment to constitute reversible error, it must call for a denial of an assertion of fact or contradictory evidence that only the defendant is in a position to offer. *Losada*

16. Article 38.08, V.A.C.C.P. reads in its entirety: Any defendant in a criminal action shall be permitted to testify in his own behalf therein, but the failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.

*v. State*, supra; *Short v. State*, 671 S.W.2d 888 (Tex.Cr.App.1984); *Johnson v. State*, 611 S.W.2d 649 (Tex.Cr.App.1981). It is not sufficient that the language might be construed as an implicit or indirect allusion as to the defendant's failure to testify. *Jones v. State*, 693 S.W.2d 406 (Tex.Cr. App.1985); *Cannon v. State*, supra; *Banks v. State*, supra; *Wright v. State*, 582 S.W.2d 845 (Tex.Cr.App.1979); *Nowlin v. State*, 507 S.W.2d 534 (Tex.Cr.App.1974). If the language used can be reasonably construed as referring to the appellant's failure to produce testimony or evidence from sources other than himself, reversal is not required. *Montoya v. State*, supra; *May v. State*, supra; *Banks v. State*, supra; *Davis v. State*, 670 S.W.2d 255 (Tex. Cr.App.1984); *Nowlin v. State*, supra.

 The record reflects that the prosecutor carefully focused upon witnesses who could place appellant inside the store and someone who could corroborate his torn pants story. We cannot say that the prosecutor's remarks "naturally and necessarily" referred to the appellant's failure to testify or were "manifestly intended" to carry such an impression to the jury. To the contrary, in his predicate remarks regarding subpoena power, the prosecutor clearly stated that he was commenting upon appellant's failure to produce testimony *other* than his own. The remarks did not refer to some particular aspect of the case that only appellant's testimony could refute, nor did the remarks call into question appellant's right to remain passive. The statements clearly named the type of witnesses the prosecutor had in mind. Under such circumstances, the remarks were not improper. See *Montoya v. State*, supra; *Davis v. State*, supra; *Banks v. State*, supra; *May v. State*, supra. Appellant's seventeenth point of error is overruled.

In appellant's eighteenth, nineteenth and twentieth points of error he contends the evidence is insufficient to support the jury's affirmative answers to the three special punishment issues.

In point of error eighteen, the appellant argues the evidence is insufficient to prove that he acted deliberately as required under Article 37.071(b)(1), V.A.C.C.P.[17] Specifically, appellant contends there is no evidence of "repetitiveness on the part of the Appellant", and that the evidence of a struggle between the deceased and appellant "caused Appellant to do something that he had no intention of doing when he first approached Complainant."

In determining the sufficiency of the evidence to support the jury's affirmative finding on Special Issue No. 1, the evidence is viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the elements of Article 37.071(b)(1), supra, to have been proved beyond a reasonable doubt. *Kunkle v. State* (Tex.Cr.App. No. 69,501, delivered June 18, 1986); *Santana v. State; Goodman v. State*, 701 S.W.2d 850 (Tex.Cr. App.1985); *DeGarmo v. State*, 691 S.W.2d 657 (Tex.Cr.App.1985) and cases cited therein.

 The term "deliberately" is not defined by statute and is therefore to be taken and understood in its normal use in common everyday language. *Rector v. State*, supra; *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr.App.1984). Thus, we do not require the State to prove that the killing was premeditated or that the defendant carefully weighed or analyzed the situation before killing the deceased in order to support a finding that he acted deliberately. *Rector v. State*, supra; *Kunkle v. State*, supra; *Smith v. State*, supra; *Granviel v. State*, supra. On the other hand, "deliberately", as used in the first special issue, is not the linguistic equivalent of "intentionally", as used in the charge on guilt-innocence. *Fearance v. State*, 620 S.W.2d 577 (Tex.Cr.App.1981); *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981). Rather, "it is the thought process which embraces more than a will to engage in conduct and activates the intentional conduct." *Fearance v. State*, 620 S.W.2d at 584. To this

---

**17.** Special issue number 1 requires the jury to find that "the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result" ... Art. 37.071(b)(1), supra.

end, "there must be the moment of deliberation and the determination on the part of the actor to kill," as found "from the totality of circumstances of the individual case." *Cannon,* supra.

The evidence, evaluated in the light most favorable to the verdict, shows appellant acquired a stolen 9mm pistol and bought ammunition for the pistol some months before the shooting. From the number of live rounds left in the box discovered during a search of his apartment and the rounds left in the clip of the gun, the jury could infer that appellant had practiced shooting the weapon at some point prior to August 10th. On that day, approximately two hours before the shooting, appellant parked his car behind the Gulf Service Station on Oak Forest Drive, with the front of the car pointed toward the street for a quick escape. He then crossed the street and waited in the Weingarten's parking lot for a victim. After observing the deceased drive up, park and go into the store, he crawled under her pickup truck and lay in wait for her to return. At some point while waiting he tied a cloth over his face and cocked the loaded pistol. As the deceased was placing her sacks of groceries inside the cab of the truck, appellant rolled out from underneath and accosted her, grabbing her purse. A struggle ensued, ending when appellant either pushed the deceased backward or stepped back himself, reached back toward the woman, leveled the pistol and shot the deceased in the throat from a distance of less than two feet. He then temporarily escaped, carrying purse and pistol, both of which he attempted to dispose of along the escape route.

This Court has repeatedly held the fact that a person is armed when entering the area of a crime or while committing a crime is itself of probative value in proving deliberate conduct. *Green v. State,* 682 S.W.2d 271 (Tex.Cr.App.1984) (cert. denied 470

U.S. 1034, 105 S.Ct. 1407, 84 L.Ed.2d 794); *Demouchette v. State,* 591 S.W.2d 488 (Tex.Cr.App.1979) (*cert. denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996); *Duffy v. State,* 567 S.W.2d 197 (Tex.Cr.App.1978). The fact that a struggle occurred does not negate the inference of deliberate conduct, see *Milton v. State,* 599 S.W.2d 824 (Tex. Cr.App.1980), especially when the inference is that the killing took place as a result of the victim's refusal to part with the particular property. See *Carter v. State,* supra. Nor are we convinced that a finding of deliberate conduct must be predicated upon repetitious harmful acts as appellant argues. In the cases appellant cites as authority, *Granviel v. State* and *Fearance v. State,* both supra, this court viewed the repeated stabbing or shooting of a victim as one factor but not the sole or even most important factor in determining deliberateness.

■ Here, appellant carried a loaded pistol to the scene of the robbery. He lay in wait for his victim. After struggling [18] with her, he apparently bested her efforts, but did not seek to escape without further harming her. Instead, the record clearly reflects he reached back, leveled and aimed the pistol at her, and squeezed the trigger with little or no chance of missing his target. There was sufficient evidence to support the jury's finding that appellant acted deliberately. Appellant's eighteenth point of error is overruled.

Appellant also challenges the sufficiency of the evidence to support the jury's affirmative answer to special issue No. 2, Article 37.071(b)(2).[19] He argues that his youth, fact that violence was not originally intended in this case, and lack of psychological predictions of further violence support his insufficiency claim.

In determining the merit of appellant's contention, we use the same standard of review set forth in our dispositions of the

18. We note that on page 77 of his brief appellant *now* contends, "... Appellant was surprised when Complainant began struggling. During the course of the struggle, the gun discharged killing the Complainant." The evidence introduced at trial *does not support his theory.*

19. Art. 37.071(b)(2): Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

preceding point of error: whether the evidence, when viewed in the light most favorable to the verdict, would lead any rational trier of fact to make the finding beyond a reasonable doubt. See *Keeton v. State,* 724 S.W.2d 58 (Tex.Cr.App.1987), and cases cited therein.

▆▆ The jury may consider all the evidence adduced at the guilt phase in reaching a determination as to the second special issue. *Keeton v. State,* supra; *Santana v. State,* supra; *Fierro v. State,* supra, and cases cited therein. The circumstances of the offense, as well as the planning and aforethought demonstrated in the execution of the offense may also be probative of a defendant's propensity to commit future violent crimes. See *Landry v. State,* 706 S.W.2d 105 (Tex.Cr.App.1985); *Demouchette v. State,* supra. Additional factors which may properly be considered are the existence of a prior criminal record and severity of prior crimes, the defendant's age and personal circumstances at the time of the offense, whether the defendant was acting under duress or domination of another at the time of the commission of the offense, psychiatric evidence, and character evidence. See *Keeton v. State,* supra, citing *Brasfield v. State,* supra; *Landry v. State,* supra; *Andrade v. State,* 700 S.W.2d 585 (Tex.Cr.App.1985); *Milton v. State,* supra; and *Hovila v. State,* 562 S.W.2d 243 (Tex.Cr.App.1978).

▆▆ On the other hand, lack of extraneous violent acts, reputation or psychiatric testimony on the issue of future dangerousness does not alone negate a finding under Art. 37.071(b)(2). See *Bush v. State,* 697 S.W.2d 397 (Tex.Cr.App.1985); see also *Brasfield v. State,* supra; *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978), supra; see also *Keeton v. State,* supra; *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981). Moreover, an accused's youth alone will not prevent the imposition of the death penalty. *Barney v. State,* 698 S.W.2d 114 (Tex.Cr.App.1985); *Cannon v. State,* supra; *Ferguson v. State,* 573 S.W.2d 516 (Tex.Cr.App.1978); *cert. denied,* 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304 (Tex.Cr.App.1979).

▆▆ In the case before us there is evidence that the murder of Janet Caldwell was a calculated act. The 21–year–old appellant was not "surprised" by the deceased; he deliberately secreted himself under her vehicle with a loaded gun and awaited her return, ostensibly after choosing his victim during the course of the previous two-hour period. After breaking away from his victim, he reached around, pointed his pistol at her head and neck area, and while she was in a lower but upright position two or less feet away from him, he shot her through and through. He had the sense of mind after shooting her to remove both the purse and the murder weapon from the scene. The circumstances of the crime itself lend support to a finding of future dangerousness.

Appellant's conduct as a sixteen year old is also compelling in regard to his propensity for future violence. The two 1978 stabbings, termed "superficial" by appellant, were unprovoked and malignant in intensity. It is not improbable that the male victim would have suffered more serious wounds had he not placed a mattress between himself and the appellant. In any event, even the multiple "superficial" stabbing of two victims is a significant and violent criminal act. The fact that appellant was granted probation does not influence us to view his prior conduct in any other light.

The final extraneous act called to the attention of the jury was appellant's acknowledged possession of a homemade knife, or "shiv", in his jail cell while awaiting trial on the present charge. Appellant's acknowledged possession of a weapon while awaiting trial on a charge of capital murder is probative of future dangerousness. The evidence is clearly sufficient to support the inference that appellant's violent tendencies were not diminished by his arrest and capital prosecution. See *Barney v. State,* supra.

Several witnesses also uniformly testified that appellant's reputation in the community for being peaceful and law abiding was bad. Joyce Jones prepared the presentence investigation report on the two at-

341

tempted murder convictions. Appellant's junior high school principal, Harlan Maresh, was also called to the stand. Houston police officers M.W. Hicks and Aldanada Alanis, both of whom had investigated the December 31, 1978 stabbings, also responded negatively to the prosecutor's query as to appellant's reputation. In sum, the evidence as reflected by appellant's prior violent criminal conduct, his bad reputation, the circumstances of the present offense and his post arrest criminal conduct is sufficient to support the jury's affirmative finding that there is a probability that appellant would constitute a continuing threat to society. Appellant's nineteenth point of error is overruled.

In his final point of error appellant contends the trial court committed reversible error in sentencing appellant to death because the evidence is insufficient to support an affirmative answer to the third special issue submitted under Art. 37.071, supra.[20] Specifically, he argues that the record is devoid of any evidence of the deceased's conduct just prior to her death, "[T]herefore, there is absolutely no way that the jury could determine that the conduct of the appellant was unreasonable beyond a reasonable doubt." See *Hernandez v. State,* 643 S.W.2d 397 (Tex.Cr.App.1983). (In order to raise the issue of provocation, it is necessary that there be evidence of the deceased's conduct just prior to the death).

■ The record reflects that the trial court recognized the lack of evidence raising the issue of whether the appellant's conduct was in response to provocation by the deceased, but submitted the third question at appellant's request. Additionally, we note that the collective uncontroverted testimony at trial supports the inference that the robbery and shooting was unprovoked. Error, if any, was invited by and was to the benefit of appellant. It is a long-standing rule that a defendant may not request a charge and when that charge is given as requested, complain on appeal of any error. *Boyette v. State,* 692 S.W.2d

512 (Tex.Cr.App.1985); *Gutierrez v. State,* 659 S.W.2d 423 (Tex.Cr.App.1983); *Ayers v. State,* 606 S.W.2d 936 (Tex.Cr.App.1980). Error, if any, was invited. See *Cadd v. State,* 587 S.W.2d 736 (Tex.Cr.App.1979); *Cain v. State,* 549 S.W.2d 707 (Tex.Cr.App. 1977), *cert denied* 434 U.S. 845, 98 S.Ct. 149, 54 L.Ed.2d 111 (1977); *Ex Parte Guerrero,* 521 S.W.2d 613 (Tex.Cr.App. 1975); *Stiles v. State,* 520 S.W.2d 894 (Tex. Cr.App.1975); *Holmes v. State,* 140 Tex.Cr. R. 619, 146 S.W.2d 400 (1940). Point of error number twenty is overruled.

The judgment is affirmed.

DUNCAN, J., concurs in the result.

TEAGUE, J., dissents.

CLINTON, J., dissents to overruling point of error nineteen.

ONION, P.J., not participating.

---

20. That issue asks the jury to determine:
 if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. Art. 37.071(b)(3), V.A.C.C.P.