

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00403-CR
### NO. 02-11-00404-CR
### NO. 02-11-00405-CR
### NO. 02-11-00406-CR

VICTOR CANTU JR.                                                APPELLANT

V.

THE STATE OF TEXAS                                                  STATE

----------

### FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant Victor Cantu Jr. appeals his convictions for two counts of aggravated robbery and two counts of unlawful restraint, all four of which included deadly weapon findings. In twelve issues, Appellant challenges the

---

[1]*See* Tex. R. App. P. 47.4.

legal sufficiency of the evidence and the propriety of the deadly weapon findings. We affirm.

## I.  BACKGROUND

### A.  FACTUAL BACKGROUND

Rebekah Davis ("Rebekah") and her husband, Festus Davis ("Festus"), had a business posting items for sale on craigslist.org.  On May 13, 2010, Rebekah posted a television for sale and arranged to meet an interested buyer at her home.  While Rebekah was inside the house, Festus stayed in the garage to meet the prospective buyer.

Festus heard a car horn and raised the garage door.  Two Hispanic men got out of a white SUV parked outside the garage, "one from each side."  One of the men was wearing a hat, and "one of them at least had sunglasses on."  Both were approximately five feet, nine inches tall, but one had a bigger body than the other.  Festus could not tell if there was another person in the SUV.  As soon as Festus showed the men the television, one of the men pulled a gun and pointed it at Festus's head.  The other man also brandished a gun and closed the garage door.  One of the men forced Festus into the house, while the other looked for Rebekah.

Meanwhile, Rebekah had heard two men yelling at Festus and threatening to shoot him and had called 911 while hiding in a bathroom.  One of the men ("Suspect One") broke into the bathroom and led Rebekah upstairs at gunpoint to Festus's office.  Suspect One was wearing a white vest and long pants.  Both

2

Rebekah and Festus stated the other man ("Suspect Two") was wearing a baseball cap and sunglasses. Rebekah believed Suspect One and Suspect Two were Hispanic.

In the office, Rebekah saw that Festus's hands and feet were bound with zip ties and that Suspect Two was pointing a gun at Festus. Suspect One bound Rebekah's hands and feet with zip ties while she begged for her life. Suspect One received a phone call at this point and he directed the caller to "come around to the back." Festus believed this meant "there was more, more of them, and someone was going to drive around the back with a truck to take everything."

Suspect One told Suspect Two to go downstairs and then began "ripping out the TVs, the computer systems, laptops, everything . . . [and] started to go through all the drawers, all the cupboards . . . in the office." A few minutes later, Suspect One's phone began to ring again. Suddenly, police sirens could be heard closing in on the neighborhood, and Suspect One and Suspect Two ran out of the home, leaving the Davises bound on the floor. They also left behind one of the guns. They took Festus's wallet, which had been in the office.

Sergeant Jesse Hunter, a Lewisville police officer, arrived at the house, walked around to the garage, and saw a still running white SUV in the driveway. Sergeant Hunter then saw a Hispanic male coming out of the garage wearing a dark shirt, dark hat, denim shorts, and black tennis shoes. Sergeant Hunter, after looking at the man "directly in the face," thought the man looked like baseball player Ivan Rodriguez. Sergeant Hunter identified himself as a police

3

officer, which caused the man to begin running. As he ran away from Sergeant Hunter, he dropped a pair of dark gloves and jumped over a wall. Sergeant Hunter stated that it is "not unusual" for suspects to have clothing underneath the "initial outer" layer and to shed clothes later. Sergeant Hunter abandoned the chase and returned to the house. A pair of sunglasses was found near where Sergeant Hunter saw the man coming out of the Davises' garage.

Two men near the Davises' house told Sergeant Hunter that another man in a white tank top had also fled the house. Other police officers in the area caught this man, who was later identified as Esteban Hernandez. Meanwhile, Michael Guenther, a neighbor of the Davises', heard a noise on his roof and saw a man in a dark shirt on the roof. Detective Richard Anders saw the man on Guenther's roof, who was wearing a baseball cap, and ran over. Once the man saw Detective Anders, the man jumped off the roof and began running. Detective Anders began chasing the man, who was no longer wearing a baseball cap, but Detective Anders lost him. Officer Michael Hernandez, who was with Detective Anders, also saw the man on the roof and noted that he was wearing dark clothes and a hat, but that he was no longer wearing the hat once he began running. Officer Hernandez identified Appellant as the man he saw on the roof after Appellant was arrested.

Shortly thereafter, Officer Joel Baker began searching a nearby gas station for the man who had been seen on Guenther's roof. Officer Baker found Appellant crouched in the bushes surrounding the gas station. He was out of

4

breath, dirty, and "very, very, very sweaty." Appellant was wearing a light purple shirt, denim shorts, and black shoes. Appellant had a loaded .40 caliber magazine in his pocket, which fit the gun left at the Davises' home. Appellant gave the arresting officers a false name and incorrect birthdate.

On the other side of a wall next to the bushes, Officer Baker found a black T-shirt that had not been there earlier when officers had searched the area looking for Suspect Two. A black baseball cap with a "P" logo later was found on Guenther's roof. Forensic testing on the cap revealed that Appellant was "the major contributor of the DNA for the baseball cap." Appellant's DNA profile also was the same as the DNA profile on the sunglasses found outside the Davises' garage. The DNA on the gun and the gloves could not be "associated" with Appellant or Hernandez; however, Appellant could not be eliminated as a contributor to the DNA found on the gun. Additionally, Festus's wallet was found in Guenther's yard.

## B. PROCEDURAL BACKGROUND

Appellant was indicted for two counts of aggravated robbery and two counts of unlawful restraint. Further, each contained enhancement paragraphs alleging that Appellant previously had been convicted of the felony offenses of

burglary of a habitation and theft. Appellant pleaded not guilty to the indicted offenses and not true to the enhancement paragraphs.[2]

At trial, Appellant testified that he was not with Hernandez in the Davises' home at the time of the robbery and named Paul Santoy, Hernandez's roommate, as Hernandez's accomplice. Appellant admitted that he was with Santoy and Hernandez on May 13, 2010, and went with them to the Davises' house in a white SUV.[3] Appellant testified that Santoy was wearing Appellant's dark baseball cap that day because Santoy routinely borrowed Appellant's "accessory items." Further, Appellant claimed Hernandez was wearing Appellant's sunglasses the day of the robbery. Before they arrived, Appellant stated that he texted his girlfriend to ask her to pick him up at the gas station near the Davises' house because he was "suspicious" of what Santoy and Hernandez were planning. Appellant told his girlfriend to "watch out for the laws [sic]" because he had a warrant out for his arrest.

Appellant further claimed that before Santoy and Hernandez got out of the car at the Davises' house, Appellant handed a gun to Santoy, but removed the

---

[2]Appellant admitted to the prior convictions, however, during his trial testimony.

[3]The SUV was owned by Santoy's girlfriend's mother; but Santoy's girlfriend refused to talk to the police after the robbery.

6

ammunition magazine and put it in his pocket. After Santoy and Hernandez entered the garage, Appellant claimed he left the SUV and walked to the gas station to wait for his girlfriend. He hid in the bushes when he heard sirens because of an outstanding arrest warrant. He asserted this also was the reason he gave officers false identification information and why he was "going into a panic mode." Appellant stated he did not begin to sweat until after he was placed in the back of the police car: "[I]t didn't take me long to start sweating after they put me in the back of the cop car." Appellant admitted he lied to police about why he was at the gas station, who he was meeting, the possible identity of one of the robbers, and why he was out of breath in order to "help [his] situation" and to protect his girlfriend. Appellant never told police about Santoy's involvement because he did not want to be considered a "snitch."

The jury found Appellant guilty of all four offenses, found the enhancement paragraphs true, and sentenced him to fifty years' confinement, to run concurrently. Each judgment contained a deadly weapon finding. This appeal followed.

## II. DISCUSSION

In twelve issues, Appellant raises two main arguments: (1) the evidence was legally insufficient to convict him as a party or a principal and to support the deadly weapon findings and (2) the deadly weapon findings were erroneous because the jury charges either wholly failed to submit the issue separately to the jury or failed to instruct the jury properly. We address each in turn.

7

## A. SUFFICIENCY

In his first four issues, Appellant asserts that the evidence is insufficient to support his convictions either as a party or as a principal. In short, Appellant relies on the victims' failure to positively identify him and his claim that he left the area before the offenses occurred to support his legal insufficiency argument.

In our due process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011). We must presume that the fact-finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

As shown by the facts recited above, the evidence implicating Appellant was, by and large, circumstantial. In a circumstantial evidence case, it is not necessary that every fact point directly to the accused's guilt. *Livingston v. State*, 739 S.W.2d 311, 329–30 (Tex. Crim. App. 1987), *cert. denied*, 487 U.S. 1210 (1988); *see Temple v. State*, 390 S.W.3d 341, 360–63 (Tex. Crim. App. 2013) (holding circumstantial evidence allowed jury reasonably to infer guilt); *Dorsey v. State*, 940 S.W.2d 169, 174 (Tex. App.—Dallas 1996, pet. ref'd) (recognizing evidence sufficient if conviction "warranted by the combined and cumulative force of all the incriminating circumstances"). The fact that a witness cannot positively identify a suspect is an issue to be weighed by the jury. *Livingston*, 739 S.W.2d at 329-30; *see Valenciano v. State*, 511 S.W.2d 297, 299 (Tex. Crim. App. 1974) (stating lack of positive identification is jury issue). When the State relies on circumstantial evidence, identification of the defendant is sufficient when, considered in relation to all the testimony, the conclusion is warranted by the combined and cumulative force of all the circumstances. *See Temple*, 390 S.W.3d at 360–63; *Livingston*, 739 S.W.2d at 330.

The Davises and Guenther, as pointed out by Appellant, were unable to positively identify Appellant as Suspect Two. However, Sergeant Hunter was "immediately" able to identify Appellant at trial as the man he saw running from the Davises' house because he looked like Ivan Rodriguez. Officer Hernandez also was able to identify Appellant as the man he saw on Guenther's roof after Appellant was arrested based on the "bottom half" of Appellant's clothing and

9

because Appellant was "sweating very heavily, as someone who would have been running." Appellant's hat was found near the scene where Suspect Two was seen hiding and his sunglasses were found outside the Davises' garage where Suspect Two was seen leaving the premises. A dark T-shirt matching what Suspect Two was seen wearing was found near where Appellant was hiding. When Officer Baker found Appellant, he was out of breath, "very dirty," and "very, very, very sweaty" even though Appellant denied he was sweating when he was found hiding in the bushes.

The facts presented reveal a mosaic of evidence that, when viewed together as a whole, would allow a rational trier of fact to find beyond a reasonable doubt that Appellant was a principal of the aggravated robbery and unlawful restraint charges and that he used a deadly weapon during the commission of the offenses. *Cf. Beall v. State*, 237 S.W.3d 841, 850 (Tex. App.—Fort Worth 2007, no pet.) (holding affirmative links to contraband established by totality of circumstances). We must take these pieces, which form the full picture of the offense, and determine if the evidence presented was sufficient for the rational trier of fact to find all the essential elements of the four offenses alleged.

The evidence showed Appellant's presence at the Davises' home before the offenses were committed and hiding nearby within a short time after the crimes, as well as his apparent flight from the scene. The description of Suspect Two's clothing matched the shorts and shoes Appellant was wearing when he

10

was apprehended and the shirt found on the path Appellant took from the Davises' house to his hiding place. *See Livingston*, 739 S.W.2d at 330 (holding clothing description combined with other evidence of the circumstances of offense legally sufficient in circumstantial evidence case); *Bickems v. State*, 708 S.W.2d 541, 543 (Tex. App.—Dallas 1986, no pet.) (holding victim's positive identification coupled with circumstantial evidence placing defendant near the scene and wearing clothes similar to those described sufficient to support conviction). The DNA evidence connected Appellant to the baseball cap found where Suspect Two was seen and the sunglasses discarded by Suspect Two at the Davises' home. *See Williamson v. State*, 104 S.W.3d 115, 117–18 (Tex. App.—Texarkana 2003, pet. ref'd) (holding DNA evidence connecting defendant to offense combined with other circumstantial evidence sufficient to support jury's verdict). At the time of his arrest, Appellant possessed the magazine from the gun left at the Davises' house, which contained ammunition. *See Schroeder v. State*, 543 S.W.2d 382, 383–84 (Tex. Crim. App. 1976) (holding defendant's possession of the same type of ammunition as that used in shooting combined with other evidence sufficient to prove identity).

During the course of the offenses, Suspect One received a phone call from a third individual whom he instructed to "come around to the back"—the place where the running SUV was discovered. The Davises testified that the phone call made it appear that there were more people involved than the two in their house. The evidence is uncontested that three, and only three, people were in

11

the SUV when it originally arrived at the home. But although Appellant gave the jury an explanation for his presence in the area of the robbery, his possession of the ammunition magazine, and his attempt to hide from the police, the jury was free to disbelieve this testimony and rely on the DNA evidence, the implausibility of Appellant's explanations, and the identification evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011); *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Regarding the sufficiency of the evidence to show Appellant used a deadly weapon, the Davises testified that both Hernandez and Suspect Two used a gun during the offenses. *See Gomez v. State*, 685 S.W.2d 333, 336 (Tex. Crim. App. 1985) (holding witness testimony that defendant used gun during commission of offense sufficient to support deadly weapon finding). Although the Davises could not identify Appellant as Suspect Two, Sergeant Hunter was able to "immediately" identify Appellant as the man he saw running from the Davises' home. Similarly, Officer Hernandez was able to identify Appellant as the man he saw on Guenther's roof. Further, Appellant was found with an ammunition magazine in his pocket that fit the gun found at the Davises' house. *See Carter v. State*, 946 S.W.2d 507, 511 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (holding victims' testimony that defendant threatened them with gun similar to gun showed at trial sufficient to support finding defendant used deadly weapon).

12

The cumulative evidence presented here was sufficient for the rational trier of fact to find all the essential elements of each count of aggravated robbery and each count of unlawful restraint and to find that Appellant participated in each as a principal and, in doing so, personally used and exhibited a deadly weapon. Because the evidence is sufficient to support Appellant's convictions as a principal, we will not address whether the evidence is sufficient to show Appellant was a party to the offenses. *See Gilmore v. State*, No. 02-11-00273-CR, 2012 WL 6632920, at *13 (Tex. App.—Fort Worth Dec. 21, 2012, no pet. h.) (declining to address evidentiary sufficiency to support conviction as a party when evidence sufficient to support conviction as principal).[4] We overrule Appellant's first four issues.

## B. DEADLY WEAPON FINDINGS AND JURY CHARGE

The parties address Appellant's remaining eight issues together "because they involve the same relevant facts"; thus, we shall do the same. Appellant argues that the trial court erred by entering deadly weapon findings in the judgments because no or insufficient special issues were submitted, rendering the jury charge inaccurate, misleading, and confusing. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 3g(a)(2) (West Supp. 2012). Appellant admits he did not object to the trial court's failure "to submit the proper special issues at trial."

---

[4]Even if we were to address this argument, we would agree with the State's arguments that the evidence was legally sufficient to convict Appellant as a party.

"[A]ll alleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *See id.* If error did occur, whether it was preserved determines the degree of harm required for reversal. *See id.* If there is error in the court's charge but the appellant did not preserve it at trial, we must decide whether the error was so egregious and created such harm that appellant did not have a fair and impartial trial—in short, that "egregious harm" has occurred. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *see* Tex. Code Crim. Proc. Ann. art. 36.19 (West 2006).

### 1. Aggravated Robbery

On the aggravated robbery charges, the trial court informed the jury that it could find Appellant guilty of aggravated robbery, as charged in the indictments, if

> you believe from the evidence beyond a reasonable doubt that [Appellant] . . . either by his own conduct, or by acting with intent to promote or assist the commission of the offense of Aggravated Robbery, as charged in the indictment[s] . . ., solicited, encouraged, directed, aided or attempted to aid [Hernandez] and/or . . . Santoy in committing the offense by threatening or placing [the Davises] in fear of imminent bodily injury or death, and [Appellant] did then and there use or exhibit a deadly weapon . . . and [Hernandez] and/or . . . Santoy did commit [aggravated robbery].

The charges also included a separate special issue directing the jury to determine if Appellant "did use a deadly weapon" during the aggravated robberies. The jury charges allowed the jury to find Appellant guilty if he acted as

14

a principal or a party to the robberies and actually used or exhibited a deadly weapon himself during the robberies.

Appellant asserts that the deadly weapon special issues were erroneous because they only addressed Appellant's use of a deadly weapon as a principal and did not include the parties language required by article 42.12, section 3g(a)(2): "[W]hen a defendant is alleged to have committed an offense as a 'party' (or as either a party and/or a principal), an affirmative deadly weapon finding can only be entered if the defendant 'knew that a deadly weapon would be used or exhibited.'"

"In general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1070 (2000). But when, as here, "the evidence clearly supports a defendant's guilt as a principal actor, any error of the trial court in charging on the law of parties is harmless." *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986); *see Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000).[5] As discussed above, the evidence was legally sufficient to allow the jury to find that Appellant was a principal in the aggravated robberies and that he actually

---

[5]The jury charge, as given, required the jury to find Appellant personally used or exhibited a deadly weapon, which effectively negated any possibility of finding Appellant guilty as a party.

15

used or exhibited a deadly weapon. Therefore, even if we assumed that the jury charge contained error, that error would be harmless. *See Gilmore*, 2012 WL 6632920, at *14. We overrule Appellant's fifth, sixth, ninth, and tenth issues.

## 2. Unlawful Restraint

Regarding the unlawful restraint charges, the trial court charged the jury that it could find Appellant guilty of unlawful restraint if

> you believe from the evidence beyond a reasonable doubt that [Appellant] . . . either by his own conduct, or by acting with intent to promote or assist the commission of the offense of Unlawful Restraint, as charged in the indictment[s] . . ., solicited, encouraged, directed, aided or attempted to aid [Hernandez] and/or . . . Santoy in committing the offense by restricting the movements of [the Davises], and [Appellant] did then and there recklessly expose [the Davises] to a substantial risk of serious bodily injury by pointing a firearm at or in the direction of [the Davises].

Once again, the charge requires proof beyond a reasonable doubt that Appellant pointed a firearm at the Davises. In our prior analysis, we found the evidence sufficient to support the verdict of guilty in each unlawful restraint case and that Appellant participated as a principal. That same evidence is sufficient to support the deadly weapon finding.

Appellant argues that the trial court could not enter deadly weapon findings on these charges because there were no separate deadly weapon special issues. The State admits that deadly weapon special issues were not submitted to the jury and that the trial court entered deadly weapon findings, but it asserts that the deadly weapon findings were "essentially" elements of the offenses.

16

Both Appellant and the State agree that a trial court may enter an affirmative deadly weapon finding if the jury (1) found the defendant guilty as charged in the indictment and the indictment alleged the use of a deadly weapon, (2) found the defendant guilty as charged in the indictment and the indictment alleged the use of a per se deadly weapon, or (3) affirmatively answered a special issue on deadly weapon use. *See Vasquez v. State*, 56 S.W.3d 46, 47 (Tex. Crim. App. 2001). Here, the jury found Appellant guilty of unlawful restraint "as charged in the indictment[s]," which alleged that Appellant "recklessly expose[d] [the Davises] to a substantial risk of serious bodily injury by pointing a firearm at or in the direction of [the Davises]." A gun is a per se deadly weapon; thus, the deadly weapon affirmative findings arose as a matter of law upon the jury's findings of guilt. *See* Tex. Penal Code Ann. § 1.07(a)(17)(A) (West Supp. 2012); *Polk v. State*, 693 S.W.2d 391, 394 (Tex. Crim. App. 1985); *see also Ex parte Empey*, 757 S.W.2d 771, 774 (Tex. Crim. App. 1988). Therefore, the trial court was authorized to enter the affirmative findings in the judgment on the use of a deadly weapon. *See Henricks v. State*, 293 S.W.3d 267, 278 (Tex. App.—Eastland 2009, pet. ref'd). We overrule Appellant's seventh, eighth, eleventh, and twelfth issues.

## III. CONCLUSION

Having overruled Appellant's issues, we affirm the trial court's judgments.

LEE GABRIEL
JUSTICE

PANEL: WALKER, MCCOY, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: May 2, 2013