

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00402-CR
No. 02-19-00403-CR

———————————————

RUDY RODRIGUEZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 371st District Court
Tarrant County, Texas
Trial Court Nos. 1567850D, 1567852D

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Appellant Rudy Rodriguez was convicted of two counts of aggravated assault with a deadly weapon for stabbing two individuals with a knife during a bar fight. Rudy[1] raises two points on appeal: (1) that the evidence was insufficient to show who stabbed the victims and therefore insufficient to support his convictions, and (2) that the trial court reversibly erred by excluding the hospital records of one of the victims. Because we disagree with Rudy's first point and conclude that he failed to preserve his second, we will affirm.

## I. Facts

At trial, it was undisputed that Rudy and his wife Susan got into a late-night fight with two other individuals—Chad Vaughn and Taylor Duffey—outside a bar. And it was undisputed that Chad and Taylor sustained severe stab wounds during or soon after the fight. But the parties disputed almost everything else about what happened.

### A. The Fight

The jury heard four different accounts: (1) Chad and Taylor's,[2] (2) Susan's, (3) Rudy's, and (4) eyewitness Matthew Rose's.

---

[1]Because Appellant shares a last name with his wife Susan, and because Susan testified at trial, we refer to Rudy and Susan by their first names. For consistency, we refer to the complainants and other non-police witnesses by their first names as well.

[2]Chad and Taylor testified separately but similarly.

## 1. Chad and Taylor's Version

According to Chad and Taylor, Chad went to the W Bar and Grill that night to meet some friends, and Taylor—who was living with Chad—tagged along. When they arrived, Rudy and Susan were already there, and Rudy was already intoxicated. Taylor worked at the W Bar (though she was not on duty that night). She knew Rudy and Susan as regular customers, so she greeted and bought shots for them. For most of the night, though, Taylor sat with Chad at another table.

Chad and Taylor testified that even though they were not sitting with Rudy and Susan, Rudy acted in an "obnoxious," "odd," and "aggressive" manner toward Chad throughout the night. Chad gave multiple examples of Rudy's behavior, such as Rudy's repeatedly throwing his hands in the air and yelling "Do you have a problem?" across the bar at Chad. Neither Chad nor Taylor could explain this behavior; in fact, Chad had never met Rudy before. Chad told the jury that it was to the point where he was "ready to leave, because [he] just felt weird" and "didn't know why the guy didn't like [him] or had animosity towards [him]."

As they openly admitted at trial, Chad and Taylor were both intoxicated by the time they left the bar. When they walked toward the exit, they passed Rudy and Susan, and words were exchanged. Ultimately, both couples took their disagreement outside.

Once outside, Rudy was yelling and "being very aggressive." Chad and Taylor then verbally "got into it" with Rudy and Susan, who was holding Rudy back with both hands. Taylor began recording Rudy's behavior with her iPhone; she planned to

show it to her boss at the W Bar since Rudy was a regular customer. But when Susan saw Taylor recording, Susan "came at [her]" and tried to grab her phone, freeing Rudy to attack Chad. Rudy swung at Chad and hit him in the face. After that, both men began hitting each other. Susan and Taylor, meanwhile, were fighting over the phone. Taylor then screamed for Chad to help her in her struggle with Susan, and as he came over and was facing away from Rudy, Chad felt a sharp, cold pain in his back. Moments later, Chad felt a second sharp pain in his side.

After Chad was stabbed, he fell backward, and Taylor dropped her phone to help him.[3] Chad's memory of the fight ended with his stabbing, but Taylor described how she and a bystander—Matthew—pulled Chad inside and asked the bartender to call 911. Taylor did not realize she herself had been stabbed until another bar patron noticed her wounded arm. Although Taylor testified that she did not see a knife, did not see Rudy stab her, and did not even remember Rudy's getting that close to her, Taylor was confident that Rudy had stabbed her and Chad.[4]

By the time law enforcement arrived, Chad was unresponsive, Rudy and Susan were nowhere to be found, and Taylor's iPhone was missing. Taylor's brother later

---

[3]Taylor testified that she, Chad, and Susan all had their hands on Taylor's phone when Chad fell.

[4]Chad testified that he does not generally carry weapons and did not have a knife with him on the night of the fight. Taylor was never asked if she had one, but other testimony indicated that Taylor did not have a knife, and the police did not find a knife at the scene.

helped the police track it using the Find My iPhone app, which placed the phone at or near Rudy and Susan's home address.[5]

### 2. Susan's Version

Susan remembered the night differently. She denied that Rudy was aggressive at any point and claimed that Chad and Taylor were arguing about their relationship.

Susan explained that she and Rudy had gone to the W Bar with a friend. When they arrived, Chad and Taylor were already there, and Taylor greeted them and bought them shots. Taylor came back later and talked with Rudy and Susan, at which point Chad approached the group and began arguing with Taylor about their relationship. Susan testified that she and Rudy intervened and encouraged Taylor to calm down and go outside. Susan admitted that everyone had been drinking, describing Chad and Taylor as "very" intoxicated. But she denied thinking that Rudy was intoxicated at all.

Rudy and Susan accompanied Chad and Taylor outside, where Susan again tried to calm Taylor down. But Taylor misunderstood Susan's attempts and came at Susan in a drunken fit. Meanwhile, Chad punched Rudy in the face and knocked him to the ground, although Susan did not explain why. As Susan restrained Taylor on the ground, Chad continued to hit and kick Rudy, knocking him unconscious. Chad then shifted to hitting Susan, finally stopping after someone threatened to call the police.

---

[5]The record is unclear whether the app placed Taylor's phone in the area of Rudy and Susan's street or precisely at their house.

Susan testified that she then released Taylor and helped Rudy into her friend's waiting vehicle, fleeing in fear for their lives. She speculated that after she and Rudy left, Chad likely stabbed both himself and Taylor.

Susan did not mention anything about Taylor's recording the interaction and could not explain why the locator app later detected Taylor's iPhone at or near her and Rudy's home.

### 3. Rudy's Version

The jury heard a slightly different account of the fight from Rudy's videotaped police interview.[6]

Rudy claimed that Chad was the aggressor and that the fight was one-sided. Rudy did not provide a detailed account of what led up to the fight but implied that Chad's alleged aggression was triggered by Rudy and Susan sharing shots with Taylor. Rudy insisted that he never hit Chad and that the only physical altercation was between "[Rudy's] face and [Chad's] fist and whatever else [Chad] had." Rudy claimed that he fled the scene because he "just wanted to get away from [Chad] before he killed us."

But Rudy acknowledged that Susan and Taylor were fighting; he nodded in apparent agreement when the interviewing detective mentioned that both women had

---

[6]Rudy did not testify at trial.

6

"admitted that they were yanking each other's hair out of their heads." This was a notable departure from Susan's version of events.

In another departure, Rudy confirmed (but did not explain why) Taylor was recording the confrontation. But like Susan, Rudy denied taking the phone or knowing why it was tracked to his home. Rudy volunteered that Taylor was "a sloppy, sloppy drunk," implying that Taylor was not credible and might have misplaced her phone.

When told about the stab wounds, Rudy insisted that he was "out" (that is, unconscious) for the majority of the fight and claimed that he "didn't have a blade" on him that night. But Rudy acknowledged that he had a knife "collection" consisting of regular gifts from his children.

Like Susan, Rudy speculated that Chad stabbed himself and Taylor. Even after learning that Chad was stabbed in the back and that the wounds were severe, Rudy insisted that "if he's cut, he's the one who had a knife," offering various theories of how a self-inflicted stabbing might have occurred.

### 4. Matthew's Version

Matthew Rose—a young Army veteran and regular bar patron who witnessed the night's events—also testified. Matthew did not know Rudy before the fight,[7] and although he had met Chad and Taylor before, he did not know them well.

Matthew's account was largely consistent with Chad and Taylor's. Matthew told the jury that Rudy was "antagonizing" Chad that evening. Matthew confirmed that Chad and Taylor were not arguing or "being loud [or] obnoxious"; he saw no apparent reason for Rudy's behavior. To Matthew, Rudy looked and sounded "pretty intoxicated," and Matthew could tell that Chad and Taylor were becoming uncomfortable.

Later that night, Matthew saw Chad, Taylor, Rudy, and Susan go outside the bar, and he followed them because he had a "gut feeling" that an issue might arise. Initially, things seemed calm, and the two couples were talking. Rudy then went inside the bar, but when he returned, the group "went from everybody being calm to, all of a sudden . . . Chad and Rudy are fighting each other[, and] Taylor and Rudy's wife are fighting each other." Rudy then "went after" Taylor, and Chad tried to help her. Matthew turned away briefly to seek help, and when he turned back around, he saw

---

[7]Susan confirmed that she did not know Matthew and agreed that he would have no reason to lie about Rudy's actions.

both Chad and Taylor bleeding. Matthew then physically separated Taylor and Susan and helped Taylor get Chad inside. Meanwhile, Rudy and Susan left.

Although Matthew did not see the stabbing and did not see a knife, he testified that Chad and Taylor "did not have a knife" and that, based on what he had seen, he "kn[e]w beyond a doubt that Rudy did stab Taylor and Chad."[8]

## B. The Injuries

Chad and Taylor sustained significant stab wounds, with Chad's being the worst. The knife penetrated into Chad's stomach lining and came close to hitting his spleen, which would likely have killed him. Taylor had her right arm sliced open, and the knife penetrated so deeply that she "saw [her] bone."

Susan testified that she bit her tongue when Chad hit her and that she received several bruises. Rudy sustained a dark black eye and a gash on his forehead for which he sought medical care the next evening. Although Susan testified that Rudy's nose was broken and that he had been knocked out by a blow to the head, she acknowledged that his medical records did not reflect any such injuries.

Photographs of all four parties' injuries were admitted at trial. Rudy also offered a copy of his medical records.[9]

---

[8]On cross-examination, Matthew admitted that he initially told the police that either Rudy *or* Susan committed the stabbing.

## C. The Investigation

Officer Ryan Abbott and Detective Brian Goen testified about their respective investigations.

Officer Abbott was the first North Richland Hills police officer to arrive at the bar. Body-camera footage that was admitted into evidence showed Officer Abbott talking to Taylor, who was visibly upset by Chad's condition. When Officer Abbott asked Taylor about "the person who did it," Taylor provided Rudy's name and description and said that she thought Rudy and Susan "stole [her] phone because [she] took videos of them."

At trial, Officer Abbott told the jury that Chad was unresponsive when he arrived and that Taylor was "frantic" and identified Rudy as the perpetrator. Officer Abbott also confirmed that he did not find any weapons at the bar. In addition, he testified that he worked with Taylor's brother to track her phone to Rudy's address using the GPS-enabled Find My iPhone app.

After Officer Abbott's on-scene response, Detective Goen took over the investigation, meeting with Chad and Taylor at the hospital roughly thirty-six hours after the stabbings. He then obtained and executed an arrest warrant for Rudy and a search warrant for Rudy's home. While Detective Goen was executing the search

---

[9] Those records revealed "[a]lcohol abuse" as part of his medical history. Susan denied that fact and testified that Rudy's problem had been in the past, "[m]any years ago."

warrant, he asked Susan for a statement, but she refused to cooperate. Detective Goen never found Taylor's iPhone or the knife used in the fight.

Detective Goen later spoke with Rudy in the videotaped interview discussed above. During that interview, Detective Goen confronted Rudy with the evidence the police had collected to that point. For example, when Rudy reported that he had been knocked unconscious, Detective Goen told him that there were multiple on-scene witnesses and "nobody ha[d] indicated [Rudy] got knocked out." When Rudy stated that he thought Chad "had ripped [his shirt] off [him]" during the fight, Detective Goen told Rudy that he had found the shirt at Rudy's house with no rips or tears. And when Rudy speculated that Chad had stabbed himself, Detective Goen described Chad's "severe" injuries as "potentially life-threatening," stating "[Chad] didn't do that to himself."

**D. The Trial**

After these witnesses testified, Rudy offered Chad's hospital records into evidence as a stand-alone exhibit, claiming that they were admissible without a sponsoring witness or business-records affidavit because they allegedly contradicted Chad's testimony about his hospital stay.[10] The trial court excluded the records on various grounds.

---

[10]Rudy had not tried to use these records to impeach Chad on cross-examination.

11

In his closing argument, Rudy emphasized that "[n]obody saw [him] stab anybody, and nobody saw a knife," and he claimed that there was "just as much evidence that it was Susan" as that it was he.

The jury nevertheless found Rudy guilty of both counts of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2). After hearing punishment evidence, the jury sentenced Rudy to three years' confinement for each offense. *See id.* §§ 12.33(a), 22.02(b).

## II. Discussion

Rudy raises two points on appeal: (1) the sufficiency of the evidence to prove that he stabbed anyone with a knife,[11] and (2) the exclusion of Chad's hospital records.

### A. Sufficiency of the Evidence (Point One)

Rudy argues that, because no one saw him stab anyone and because no one saw him with a knife, the jury was left to speculate which of the four fight participants

---

[11]Rudy's appellate brief claims "[t]here was no evidence that Appellant possessed a knife" and notes that "no one even saw a knife." It is unclear whether these statements are part of his identity-related sufficiency challenge, or whether he intended to separately assert that the evidence was insufficient to prove the offense was committed with a knife. *See* Tex. Penal Code Ann. § 22.02(a)(2). Adding to the confusion, Rudy has conceded both at trial and on appeal that "two people got stabbed." Nonetheless, the State interprets Rudy's brief as asserting a separate knife-related sufficiency challenge.

12

committed the stabbings.[12] Rudy acknowledges that "the State's theory of the case [wa]s certainly *plausible*," but he argues that this theory was "based on nothing but speculation" because the evidence was of insufficient "quality"[13] to "directly implicat[e] Appellant (and only Appellant) in the act of stabbing both [Taylor] and [Chad]."[14]

We disagree. The collective weight of the circumstantial evidence was more than sufficient to "engender certainty beyond a reasonable doubt in the reasonable factfinder's mind" that Rudy was the person who committed the stabbings. *See Brooks*, 323 S.W.3d at 918 (Cochran, J., concurring with plurality opinion).

---

[12]In his brief, Rudy implicitly acknowledges that a reasonable jury could have inferred that the two stabbings were committed by the same person: "[I]t is certainly possible that [Chad] accidentally cut [Taylor] and wounded himself during the confusion of the brawl. For that matter, Susan is as likely a candidate as anyone for having lashed out with a knife."

[13]Justice Cochran's concurrence in *Brooks* explained that "[l]egal sufficiency in criminal cases is judged by the quality, not the quantity, of evidence supporting the accuracy of the verdict"; the evidence as a whole must be of "sufficient strength, character, and credibility to engender certainty beyond a reasonable doubt in the reasonable factfinder's mind." *Brooks v. State*, 323 S.W.3d 893, 917–18 (Tex. Crim. App. 2010) (Cochran, J., concurring with plurality opinion). Rudy invokes this quality–quantity distinction.

[14]If Rudy is suggesting that the State had to prove that no one else committed the stabbings, that would be incorrect. We do not ask whether the State "disprove[d] all reasonable alternative hypotheses that are inconsistent with the defendant's guilt"; rather, we ask "whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)).

**1. Standard of Review**

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). An essential element of any crime is the perpetrator's identity. *See Russell v. State*, 113 S.W.3d 530, 541 (Tex. App.—Fort Worth 2003, pet. ref'd) ("Identity is an 'elemental fact' in every criminal case[.]").

A perpetrator's identity "can be proved by direct or circumstantial evidence." *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986); *see Gardner v. State*, 306 S.W.3d 274, 285–86 (Tex. Crim. App. 2009) (holding evidence sufficient even though "no witness could affirmatively 'put him at the scene'"); *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ("[T]he lack of direct evidence is not dispositive of the issue of a defendant's guilt."). Circumstantial evidence is just as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

"In circumstantial[-]evidence cases, it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Temple v. State*, 390 S.W.3d 341, 359–60 (Tex. Crim. App. 2013) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

Our evidentiary-sufficiency review is "holistic" and focuses on the cumulative force of all the evidence and the reasonable inferences that can be drawn from it. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Guillory v. State*, No. 02-18-00428-CR, 2019 WL 2554242, at *6 (Tex. App.—Fort Worth June 20, 2019, no pet.) (per curiam) (mem. op., not designated for publication).

Juries may draw reasonable inferences from circumstantial evidence as long as the evidence supports each inference.[15] *See Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *See Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015). The factfinder alone judges the evidence's weight and credibility; we may not substitute our judgment for the factfinder's. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman*, 520 S.W.3d at 622; *Hernandez v. State*, 161 S.W.3d 491, 500 (Tex. Crim. App. 2005) ("[T]he trier of fact . . . not the appellate court . . . [i]s free to accept or reject all or any portion of any witness's testimony." (quoting *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992)).

---

[15]A permissible inference is a "conclusion reached by considering other facts and deducing a logical consequence from them," while impermissible "[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007).

## 2. The Evidence

Viewing the evidence in a light most favorable to the verdict, a reasonable jury could have concluded that even though no knife was found, Rudy was the person who committed the stabbings. This conclusion is supported by the evidence of (a) Rudy's unique positional opportunity to stab Chad, (b) his behavior before the stabbings, (c) his flight afterward, (d) his and Susan's attempts to conceal evidence of his behavior, and (e) his (and Susan's) implausible explanations of events. *See, e.g.,* *Temple*, 390 S.W.3d at 360–63 (affirming murder conviction based in part on circumstantial evidence of defendant's opportunity, inconsistent statements, reaction to wife's death, actions after the death, and attempts to suppress witness testimony); *Tezino v. State*, 765 S.W.2d 482, 485–86 (Tex. App.—Houston [1st Dist.] 1988, pet. ref'd) (affirming injury-to-a-child conviction based on circumstantial evidence of defendant's prior abuse, failure to render aid, concealment of pertinent evidence, flight, implausible testimony, and initial silence regarding key facts to which he later testified).

### a. Opportunity

Although opportunity is not sufficient to prove identity, it is a circumstance "indicative of guilt." *Temple*, 390 S.W.3d at 360–61 (holding evidence sufficient based in part on opportunity); *see also Livingston v. State*, 739 S.W.2d 311, 330 (Tex. Crim. App. 1987) (noting that defendant's presence near the victim around the time of the shooting was a "facto[r] from which an inference of guilt may be drawn").

16

Rudy was the only one there with the opportunity to wound Chad, because Rudy was the only person behind Chad when Chad was stabbed in the back. Chad testified that he was trying to separate Taylor and Susan—with his back to Rudy—when he felt a sharp, cold pain in his back. And although Taylor's testimony was slightly different, she too described Rudy as the only fight participant positioned to stab Chad. Taylor testified that her, Chad's, and Susan's hands were all on Taylor's phone when she saw Chad fall backward from his initial stab wound. Moreover, Matthew testified that Rudy "went after" Taylor after his fight with Chad, making Rudy the only one involved who had the opportunity to assault both Chad and Taylor. *See Hernandez*, 161 S.W.3d at 500.

### b. Behavior Before the Stabbings

Rudy's earlier behavior was also incriminating. *See Guevara*, 152 S.W.3d at 49 ("In reviewing the sufficiency of the evidence, we should look at 'events occurring before, during[,] and after the commission of the offense[.]'" (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985))); *Tezino*, 765 S.W.2d at 485 (holding evidence sufficient to support injury-to-a-child conviction based in part on evidence of prior abuse). Before the fight, Rudy exhibited aggressive behavior consistent with the disproportionately violent nature of the stabbings. The jury heard evidence that (1) Rudy was antagonistic and aggressive toward Chad for no apparent reason,

17

(2) Rudy was intoxicated, and (3) when Chad and Rudy began arguing outside, Susan had to hold Rudy back.[16]

### c. Flight from the Scene

After the stabbings, Rudy and Susan fled the scene. "Flight is circumstantial evidence from which a jury may infer guilt." *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App.—Fort Worth 2014, pet. ref'd); *see Livingston*, 739 S.W.2d at 330 (holding evidence sufficient and noting flight as a "facto[r] from which an inference of guilt may be drawn"); *Ramirez v. State*, No. 2-05-104-CR, 2006 WL 1102389, at *3 (Tex. App.—Fort Worth Apr. 27, 2006, pet. ref'd) (mem. op., not designated for publication) ("The fact that Appellant fled the scene indicates a consciousness of guilt, which may be one of the strongest indicators of guilt.").

### d. Attempts to Conceal Evidence

Rudy and Susan also attempted to conceal the presumably incriminating evidence of Rudy's behavior that Taylor captured on her phone. "Attempts to conceal incriminating evidence . . . are probative of wrongful conduct and are also circumstances of guilt." *Guevara*, 152 S.W.3d at 50; *see also King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (noting that "appellant's false statements to the media []

---

[16]Although Rudy argues that the testimony was "unclear" about what Susan was "trying to prevent" by holding him back, we disagree with the tacit notion that the jury could not have drawn a reasonable inference from this fact. Chad and Taylor both testified that when Susan released her hold on Rudy, Rudy physically attacked Chad.

indicat[ed] consciousness of guilt and an attempt to cover up the crime"); *Livingston*, 739 S.W.2d at 330 (recognizing that appellant's "attempting to suppress evidence . . . [was] probative of guilt"); *Tezino*, 765 S.W.2d at 485 ("Concealment of pertinent evidence supports an inference of guilty knowledge by the appellant as to such evidence.").

Chad and Taylor testified that after Susan saw Taylor recording Rudy's aggressive behavior, Susan tried to take Taylor's phone.[17] That phone disappeared from the scene after the stabbings, and the Find My iPhone app pinged the phone near Rudy and Susan's home.

Given this evidence, the jury could have reasonably inferred that either Rudy or Susan took Taylor's phone from the bar to their home to conceal evidence of Rudy's behavior. And because the phone was never recovered, the jury could have reasonably inferred that whoever had the phone did not want the video to be available at trial. Such concealment was indicative of guilt. *See Guevara*, 152 S.W.3d at 50; *King*, 29 S.W.3d at 565; *Livingston*, 739 S.W.2d at 330.

---

[17]This testimony was supported by surveillance video from an adjacent business. That video was introduced at trial and showed Susan chasing Taylor and attempting to grab an object—presumably Taylor's phone—from her hand. (The video did not capture the fight, though, and neither Rudy nor the State argues that it somehow bears on evidentiary sufficiency.)

### e. Implausible Explanations

Additionally, Rudy's numerous "implausible explanations to the police [we]re probative of wrongful conduct and [we]re also circumstances of guilt." *Guevara*, 152 S.W.3d at 50–51 (holding evidence sufficient based in part on the defendant's false and inconsistent statements); *see Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011) (reiterating that "a fact finder can consider a defendant's untruthful[,] . . . 'implausible[,]' and inconsistent statements . . . as affirmative evidence of guilt"). For example, Rudy told Detective Goen that Chad likely stabbed himself in the back and the side—a feat that would have required extraordinary flexibility and high pain tolerance. Rudy also told the detective that Chad must have stabbed Taylor, even though Taylor's reaction to the stabbings—captured on Officer Abbott's body camera—reflected distress over Chad's condition rather than the rage one might expect if Chad had just stabbed her. Perhaps more implausibly, Rudy denied that either he or Susan took Taylor's iPhone even though the locator app placed it at or near Rudy's home.

Susan echoed Rudy's implausible explanations, adding to them her testimony that (1) she merely "restrained" Taylor in an attempt to calm her, despite previously admitting to Detective Goen that she was pulling Taylor's hair out of her head; (2) Rudy was not intoxicated, despite a night of drinking and multiple witnesses' reporting that he looked and sounded intoxicated; and (3) Rudy sustained a broken

nose and head trauma during the fight, despite medical documentation that mentioned nothing to that effect.

"Given the discrepancies between the evidence and [Rudy and Susan's] statements, the jury reasonably could have found that [Rudy and Susan] w[ere] not credible." *King*, 29 S.W.3d at 564 (concluding that jury could have found appellant not credible where his story contradicted other testimony and blood evidence). The jury's verdict indicates that it so found. And "there [cannot] be any question that, if the jury were satisfied, from the evidence, that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right . . . to regard [such] false statements . . . as in themselves tending to show guilt." *Wilson v. United States*, 162 U.S. 613, 620–21, 16 S. Ct. 895, 898–99 (1896); *see Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (quoting *Wilson* and recognizing jury's right to disbelieve appellant's statements and consider such untruthful statements as evidence of guilt). The jury could thus take Rudy and Susan's untruthful statements as proof of Rudy's culpability. *See Livingston*, 739 S.W.2d at 329 (holding evidence sufficient based in part on defendant's "unusual and contradictory" story).

Taking the cumulative effect of all the circumstantial evidence—Rudy's opportunity, behavior before the stabbings, flight from the scene, attempts to conceal evidence, and implausible explanations—the jury did not need to "mere[ly] theoriz[e] or guess[ ] about the possible meaning of facts and evidence presented." *Hooper*,

214 S.W.3d at 16. A rational jury could have found beyond a reasonable doubt that Rudy was the individual who stabbed Chad and Taylor with a knife. *See id.*

We overrule Rudy's sufficiency challenge.

## B. Exclusion of Chad's Hospital Records (Point Two)

In his second and final point, Rudy claims that the trial court erred by excluding Chad's medical records. Rudy argues that the records were admissible under the rule of optional completeness to "fully underst[an]d or to explain" Chad's hospital stay. *See* Tex. R. Evid. 107. But as the State points out, Rudy waived his optional-completeness argument at trial.

At the end of his case-in-chief, Rudy offered Chad's hospital records as a stand-alone exhibit to contradict Chad's testimony about how long he stayed in the hospital and his condition on the day he gave a statement to law enforcement.[18] The State objected on hearsay and authentication grounds as well as the fact that the bottom of each page was cut off. In reply, Rudy invoked the rule of optional completeness—the rule he relies on now. But when the trial court explained that the rule of optional completeness did not apply to what could arguably have been impeachment evidence, Rudy conceded the issue:

---

[18]The trial court sustained the State's initial objections, but—after both sides closed—it allowed Rudy to make a bill of exception outside the jury's presence. *See* Tex. R. App. P. 33.2.

THE COURT: These records simply are not in admissible format. And they're not optional completeness . . . .

They're potential impeachment possibly, but . . . they're not completing a document or a videotape or an audiotape that's in evidence. That's what optional completeness is.

[Rudy's counsel]: Yes, Your Honor. They are – *we'll concede that*, but . . . we do agree that they're essential for rebuttal. They do directly contradict testimony that was given by –

THE COURT: They still have to be in admissible format. You could . . . impeach a witness with them, or they can be admissible with a records affidavit. But right now, they're hearsay. [Emphasis added.]

Because Rudy conceded that the records did not fall under the rule of optional completeness, he did not preserve that particular challenge for review. *See* Tex. R. App. P. 33.1(a). We overrule Rudy's second point.

### III. Conclusion

Having overruled Rudy's two points, we affirm the trial court's judgments of conviction.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 26, 2021